[No. F022775. Fifth Dist. May 3, 1999.]

MITCHELL A. MAJOR et al., Plaintiffs and Appellants, v.
MEMORIAL HOSPITALS ASSOCIATION et al., Defendants and
Appellants;
GOULD MEDICAL FOUNDATION et al., Defendants and Respondents.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts I, II, IV.A, IV.B(1) and (2), V, VI, and VII.

**COUNSEL**

Strauss, Neibauer, Anderson & Ramirez and Mina L. Ramirez for Plaintiff and Appellant Mitchell A. Major.

Robert N. Meals for Plaintiffs and Appellants George Maurice Turner and Douglas E. Freeman.

Hassard Bonnington and David E. Willett for American Society of Anesthesiologists as Amici Curiae on behalf of Plaintiffs and Appellants.

Catherine I. Hanson and Kimberly S. Davenport for California Medical Association as Amicus Curiae of behalf of Plaintiffs and Appellants.

Sagaser, Hansen, Franson & Jamison, Daniel O. Jamison and Kristi R. Culver for Defendants and Appellants Memorial Hospitals Association, William K. Piche and Marcus Shouse.

Trimbur, Davis & Clark and Gary S. Davis for Defendant and Appellant Marcus Shouse.

Schuering, Zimmerman & Scully, Leo H. Schuering, Jr., and Lawrence S. Giardina for Defendants and Respondents.

McDonough, Holland & Allen, Ann O'Connell and Mary Powers Antoine for California Healthcare Association as Amicus Curiae on behalf of Defendant and Appellant Memorials Hospitals Association and Defendants and Respondents Gould Medical Foundation and the Gould Medical Group, Inc.

## OPINION

**WISEMAN, J.**—When considering quality hospital care, three main interest groups generally come to mind: patients, physicians, and hospital administration. No one could seriously question that the primary goal of physicians and hospital administration is to provide quality medical care. Even so, that does not prevent disputes from arising between these groups, and even within an individual group. Such was the case here, where various problems ultimately led to Memorial Hospitals Association's decision to change its anesthesiology department from an open staff system to a closed system with an exclusive provider.

The rub occurred when the new exclusive provider did not offer subcontracts to the three plaintiff physicians, all former members of the anesthesiology department's open staff. Plaintiffs sued based on multiple theories, including alleged violations of the Unruh Civil Rights Act (Civ. Code, § 51), breach of contract, civil conspiracy, and tortious interference with plaintiffs' professional business relationships. Plaintiffs lost on all counts during a lengthy court trial, and this appeal followed. We affirm.

In the published portions of this opinion, we clarify our holding in *Mateo-Woodburn* v. *Fresno Community Hospital & Medical Center* (1990) 221 Cal.App.3d 1169 [270 Cal.Rptr. 894] (*Mateo-Woodburn*). In doing so,

we reject any inference that a hospital has a legal obligation to offer an incumbent physician a position in a closed department as a precondition to finding a closure decision is quasi-legislative rather than adjudicative. We also reject plaintiffs' claim challenging the exclusive provider's selection of subcontractors.

In the unpublished portions, we address plaintiffs' remaining claims, including the alleged violation of the Unruh Civil Rights Act, and find there was substantial evidence of compliance with the medical staff bylaws.

PROCEDURAL HISTORY

On July 31, 1992, Dr. George M. Turner filed suit against Memorial Hospitals Association, doing business as Memorial Hospital/Medical Center Modesto and Memorial Hospital Ceres (collectively Memorial Hospitals), William K. Piche, Gould Medical Foundation, Drs. Kenneth Imanaka, Daniel E. Sucha, Douglas Diehl, Larry Todd, Bruce Gesson, and Does 1 through 30 (defendants). The complaint alleged seven causes of action: (1) violation of the Unruh Civil Rights Act; (2) injunctive relief to prevent interference with the right to practice a profession; (3) restraint of trade; (4) tortious interference with plaintiff's professional business relationships; (5) breach of contract; (6) defamation; and (7) civil conspiracy. On the same date, Drs. Douglas Freeman and Mitchell Major filed an identical complaint against the same defendants. Both complaints were subsequently amended to add Dr. Marcus Shouse and Gould Medical Group, Inc.,[1] as defendants.

On September 30, 1992, the trial court denied plaintiff's request for a preliminary injunction, and on October 22, 1992, the two actions were consolidated for all purposes. On September 28, 1993, the court granted defendants' motion for summary adjudication with respect to the third cause of action, restraint of trade. Trial began on November 11, 1993, and the parties waived trial by jury. On the third day of trial, Dr. Gesson was dismissed as a defendant. On February 7, 1994, the trial court granted the defendants' motion for judgment under Code of Civil Procedure section 631.8 in favor of Drs. Diehl, Todd, and Sucha.

After posttrial briefing and argument, the court entered judgment in favor of defendants on all remaining causes of action. The court subsequently denied defendants' motion for attorney fees. Plaintiffs filed a timely appeal raising seven contentions: (1) the trial court erred when it found there was no violation of the Unruh Civil Rights Act; (2) the trial court erred in concluding the plaintiffs waived any objection to the procedure used by Memorial

[1]Gould Medical Foundation and Gould Medical Corp., Inc., will be referred to collectively as "Gould."

Hospitals to close the anesthesiology department; (3) the trial court erred when it found the decision to close the anesthesiology department was not directed at a particular physician or group of physicians; (4) the trial court erred in holding the process of closing the anesthesiology department was not arbitrary, capricious, contrary to established public policy or procedurally unfair; (5) the trial court erred in not considering the closure of the anesthesiology department as an "integrated whole"; (6) the process used to close the anesthesiology department did not comply with the provisions of the medical staff bylaws; and (7) Memorial Hospitals had a legal obligation to ensure plaintiffs were offered a subcontract to work in the closed department. Memorial Hospitals filed a cross-appeal claiming the trial court abused its discretion in denying its motion for attorney fees.

FACTUAL HISTORY

During all relevant times, Memorial Hospitals was a nonprofit, private organization. It operated two hospitals in Stanislaus County, with its main facility in Modesto, and a smaller hospital in Ceres. The active medical staff of Memorial Hospitals consisted of 32 different subspecialties and was very involved in trauma, cardiac, orthopedic and general surgery. Memorial Hospitals had a chief executive officer as well as a board of directors made up primarily of lay people. The active medical staff was divided into 11 clinical departments, one of which was anesthesiology. Each department had a chairperson who served a two-year term and whose responsibilities included administration of the department, enforcement of the medical staff bylaws, and monitoring the quality of patient care.

The medical staff of Memorial Hospitals was governed by the provisions of the medical staff bylaws which provided "the professional and legal structure for Medical Staff operations, organized Medical Staff relations with the Board of Directors, and relations with applicants to and members of the Medical Staff." These bylaws provided for the creation of a number of committees, one of which was the medical executive committee (MEC). The MEC was composed of the officers of the medical staff and the department chairpersons. The MEC's responsibilities included making recommendations to Memorial Hospitals' board of directors, evaluating the medical care rendered to patients, as well as reviewing the qualifications, credentials and professional competence of medical staff members. The MEC was authorized to represent and act on behalf of the medical staff in the intervals between medical staff meetings. Another committee of the Memorial Hospitals' medical staff was the quality assessment committee (QAC). The QAC was responsible for identifying potential problems in patient care, referring the problems to the appropriate department for assessment and corrective

action, and monitoring the results of quality assessment throughout the hospitals.

As a general rule, a physician was not entitled to exercise clinical privileges at the hospitals operated by Memorial Hospitals unless he or she had received appointment to the medical staff. Initial appointment was for no more than two years and was subject to a biennial review on the date of the physician's medical license renewal date. Once appointed to the medical staff, a physician was entitled to a hearing before his or her appointment or clinical privileges could be revoked, terminated or suspended. Article VII of the medical staff bylaws established the procedures required for such a hearing, including a mechanism for appealing any adverse decision. However, section 7.6-1(b) of the medical bylaws specifically exempted from the hearing requirements of Article VII: "[T]he termination of privileges following the decision determined to be appropriate by the Medical Staff to close a department/service pursuant to an exclusive contract . . . ."

Section 7.6-1 of the medical staff bylaws also provided for participation of the MEC in any decision to close a department in the hospitals: "A decision by the Board of Directors to close or continue closure of a department/ service pursuant to an exclusive contract shall not be made until a review by the Medical Executive Committee of the related quality of care issues pursuant to Section 13.10 and a recommendation of appropriateness of the closure, or continued closure as set forth below. The Board of Directors shall ratify the Medical Executive Committee's recommendation unless the Board of Directors makes specific written findings that the Medical Executive Committee's recommendation is arbitrary, capricious, anti-competitive, an abuse of discretion, not compatible with the Association's mission, goals and objectives, or otherwise not in accordance with the law." Section 13.10 specifically provided for involvement of the medical staff in any decision to close a department: "The Medical Staff shall review and make recommendations to the Board of Directors regarding quality of care issues related to exclusive arrangements for Physician and/or professional services, prior to any decision being made, in the following situations: a) the decision to execute an exclusive contract in a previously open department or service; b) the decision to renew or modify an exclusive contract in a particular department or service; c) the decision to terminate an exclusive contract in a particular department or service."

Memorial Hospitals' medical staff of approximately 500 physicians included approximately 100 who were affiliated with Gould. Gould was a California corporation which provided professional medical services and accounted for approximately 50 percent of the patient load and dollar

volume at Memorial Hospitals. The physicians on the medical staff of Memorial Hospitals who were not affiliated with Gould were referred to as "independent." In September 1985, Gould formed its own anesthesiology department, and thus the anesthesiology department of Memorial Hospitals included both Gould and independent anesthesiologists. As a general rule, the independent anesthesiologists provided services for the independent surgeons and the Gould anesthesiologists provided services for the Gould surgeons, each group making its own schedule and functioning autonomously. However, occasionally the independent anesthesiologists would cover for their Gould counterparts and vice versa. This is commonly referred to as an "open" staff.[2]

Drs. Major and Turner joined the medical staff of Memorial Hospitals as independent anesthesiologists in 1986, and Dr. Freeman joined as an independent in 1988. When Dr. Freeman became a member of the medical staff, there were five Gould anesthesiologists in the department: Drs. Imanaka, Sucha, Gesson, Todd, and Vanderwalker.

As early as May 1986, there were documented problems with the operation of the anesthesiology department of Memorial Hospitals. At a meeting of the department on May 12, 1986, an incident involving the failure of an anesthesiologist to respond appropriately to a scheduled emergency surgery was discussed. Over the next five years, there were numerous other documented incidents of anesthesiologists not responding in a timely manner. These included one time when an anesthesiologist failed to appear for a scheduled cesarean section; a delay in obtaining an anesthesiologist for a patient with severe head trauma; and delays in scheduled surgery at the Ceres hospital due to lack of an anesthesiologist. Additionally, there were numerous incidents of difficulty in locating anesthesiologists who were on call. The delays in obtaining an anesthesiologist for cesarean sections resulted in Memorial Hospitals not meeting the national standards for those deliveries.

There were also numerous documented incidents of problems with scheduling anesthesiologists. There were allegations made by both Gould and independent anesthesiologists that other anesthesiologists were manipulating the schedule for financial reasons. There were incidents of conflict between

---

[2]". . . In an 'open staff' system, all 'qualified' physicians with medical staff privileges are permitted to work at the Hospital in their respective medical departments. Under a 'closed system,' the hospital contracts with an 'exclusive provider' or particular physician group for certain medical services, thereby 'closing' the medical practice to other physicians who are not members or employees of the contracted physician group." (*Janda* v. *Madera Community Hosp.* (E.D.Cal. 1998) 16 F.Supp.2d 1181,1183; see *Mateo-Woodburn, supra,* 221 Cal.App.3d at p. 1175.)

anesthesiologists' schedules, and miscommunication of scheduled vacations that resulted in gaps in coverage of scheduled surgeries. Drs. Major and Freeman were upset about often having to cover for Dr. Turner because he lived in Oakland.

Contributing to the scheduling problem was an insufficient number of independent anesthesiologists to cover all the surgery scheduled at both Memorial Hospitals' facilities. For example, at one point Dr. Major said he could not continue surgery because he was beginning to hallucinate due to fatigue. The shortage of anesthesiologists also resulted in the inability of the department to fill the OB/GYN department's request for epidural anesthesia services except on a case-by-case basis. The independent anesthesiologists claimed to have made efforts to recruit additional physicians beginning in January 1990. However, although on one or two occasions a new anesthesiologist would work for a short period of time, none of them stayed on a permanent basis. Additionally, some temporary anesthesiologists did not have acceptable credentials. One *"locum tenens"*[3] recruited by an independent anesthesiologist did not have his drug license because of prior incidents of drug abuse. The problems resulting from a shortage of anesthesiologists were also exacerbated because some of those who were available, including Drs. Major, Turner, and at least two Gould anesthesiologists, declined to provide anesthesia services for cardiac surgery.

The conflicts in scheduling often resulted in anesthesiologists being late for scheduled surgery, and one time Dr. Freeman did not show for a scheduled case because he was too tired to continue. Between 1986 and 1991, the problems of obtaining anesthesia services at Memorial Hospitals' facilities was discussed not only in meetings of the anesthesiology department, but also in meetings of the OB/GYN department, the orthopedic department, the QAC, and MEC.

Beginning in 1988, there was a long history of problems with narcotics accountability and documentation in the anesthesiology department. These problems were discussed at various staff meetings between August 1989 and March 1990. A new narcotics documentation procedure was implemented in April 1990, but problems with accountability and documentation of controlled drugs persisted into September 1990.

The minutes of the MEC meeting on October 23, 1990, indicate the narcotics documentation problem had been resolved. However, on June 28, 1991, the anesthesiology department was informed that some anesthesiologists were still not filling out the narcotics documentation correctly. Michael

---

[3]"[A] practitioner who temporarily takes the place of another." (Dorland's Illus. Medical Dict. (26th ed. 1990) p. 756.)

Spencer, the pharmacy director at Memorial Hospitals, stated that it took Dr. Freeman four to six months to comply with the new procedures, and Dr. Turner never did fully comply. In addition, a survey of the anesthesia carts conducted on November 6, 1991, found many of them unlocked and medication vials and/or syringes on the carts or in open drawers. A similar survey on January 24, 1992, revealed continuing problems with security and cleanliness of the anesthesia carts.

The failure to adequately document and account for narcotics was a serious problem for Memorial Hospitals. Failure to adequately account for narcotics posed a danger that they could be diverted and misused. In fact, there was an operating room (OR) nurse at Memorial Hospitals who was taking unused narcotics from the anesthesia carts and using them. In addition, failure to adequately account for controlled substances could result in the hospital losing its accreditation.

There was considerable evidence of other problems in the anesthesiology department. At a meeting of the orthopedic department in October 1986, concern was voiced about an anesthesiologist entering the OR in street clothes. Dr. Turner's clinical privileges were suspended in 1989 and 1991, when he allowed his Drug Enforcement Agency (DEA) drug certificate to lapse. In 1989, there were problems with anesthesia administered to 2 patients, ages 69 and 10.

The anesthesiology department was also dilatory in responding to requests to review issues referred by the QAC. On June 16, 1990, the QAC sent a letter to the anesthesiology department requesting that it respond with a plan to address six reviews in Dr. Turner's file regarding delays in providing anesthesia, and personality conflicts. The department did not respond until October 2, 1990. It stated Dr. Turner had been counseled on an incident when he responded to a call with alcohol on his breath, and the personality conflicts he was having with other staff members. In March 1991, the QAC discussed the fact the anesthesiology department was delinquent in reviewing charts referred to it. On April 7, 1992, the QAC sent a letter to the anesthesiology department requesting a response to a March 5th inquiry concerning action taken by the department on three case reviews in Dr. Turner's file regarding quality of care and physician misconduct. The department responded on April 13th, stating Dr. Turner was counseled on personality conflicts and indicating the department would continue to monitor his behavior for any further episodes.

There were numerous other claims of misfeasance and malfeasance on the part of anesthesiologists, including one incident where poor communication

between an anesthesiologist and a surgeon resulted in surgery being performed on the wrong hip of a patient. Dr. Imanaka was critical of Dr. Major's behavior, which included playing guitar in OR and inattention to patients. It was alleged by both physicians and nurses that Dr. Major spent an inordinate amount of time on the telephone in OR tending to his commodities trading. Dr. Major allegedly installed a coffeemaker on his anesthesia cart and brought it into the OR, in violation of health and safety regulations. He was also observed in the OR to mix liquid diet drinks on his cart. David Benn, chief operating officer of Memorial Hospitals, received complaints about the anesthesia department from orthopedics, emergency medicine, OB/GYN, the trauma committee, and the QAC.

In addition to the other problems in the anesthesiology department, there were persistent difficulties with communication and personality conflicts within the department and with other medical staff members. As early as September 1989, Dr. Turner stated at a meeting of the anesthesiology department that he would discontinue giving anesthetic care for a particular surgeon with whom he had a conflict. There were requests by surgeons to not be assigned particular anesthesiologists—both independent and Gould. Due to the severity of the problem, on December 11, 1990, Dr. Salahuddin Bibi, the chief of staff, sent a letter to the anesthesiology department advising them of the need to resolve the conflicts they were having with surgeons at Memorial Hospitals. However, the problems continued, with Dr. Turner reporting to the department on July 26, 1991, of two incidents of personality conflicts with a surgeon.

The personality conflicts were not confined to the anesthesiologists' relationship with the surgeons at Memorial Hospitals. They also had serious personality conflicts among themselves. For a long period while Dr. Major was chairman of the department, he and Dr. Turner would not speak to each other. Dr. Major complained repeatedly to Benn about Dr. Turner, stating he believed Dr. Turner abused drugs and came to work with alcohol on his breath. There was one incident reported where Dr. Turner argued with Dr. Major over helping a child who had just come out of surgery, was having trouble breathing, and was turning blue. Dr. Turner reportedly elbowed Dr. Major out of the way, claiming the child was his patient. As a result, Dr. Major refused to ever cover any of Dr. Turner's patients. Dr. Turner told a nurse he believed Dr. Major was making crank calls to him and on one occasion had placed a gasoline-soaked rag under the hood of Dr. Turner's car.

There was also an incident when Dr. Turner and Dr. Freeman were arguing in the presence of a patient who was awake, lying on a gurney. As

a result, Dr. Bibi sent another letter to the anesthesiology department warning that any similar situations in the future would be dealt with by the MEC and board of directors. In October 1991, Dr. Freeman had a conflict with Dr. Imanaka over a patient, which resulted in a discussion at an anesthesiology department meeting of the need for cooperation between the independent and Gould anesthesiologists. Dr. Turner often had conflicts with nurses, would shout at them, and at least one time in March 1992, physically struck a nurse.

On May 14, 1990, the anesthesiology department was notified the MEC had formed an ad hoc committee to address complaints by surgeons about the department, including quality, personality conflicts and the availability of anesthesia services. The members of the department were also informed the MEC had recommended an outside anesthesiologist be commissioned to review their charts. The members of the ad hoc committee were Dr. Marcus Shouse, medical director of the emergency department, Dr. Mary Ann Piskun, a Gould surgeon, and Dr. Phillip Deos, a pathologist. After the ad hoc committee was formed, Dr. Bibi contacted Dr. Maher Abadir, an anesthesiologist, and asked him to review the delivery of anesthesia at Memorial Hospitals.

Dr. Abadir was asked to conduct a review of the entire department. He was also told Memorial Hospitals wanted a neutral opinion on the quality of anesthesia services at its facilities. When he first arrived to conduct the review, Dr. Abadir was only given three charts: two pertained to cases of Dr. Major; and one to a case of Dr. Turner. Dr. Abadir requested 50 charts selected randomly for each physician. After reviewing them, Dr. Abadir prepared a report which he addressed to Dr. Bibi. However, the only person who recalled ever seeing Dr. Abadir's written report was Dr. Shouse. Dr. Abadir did not keep a copy, Dr. Shouse could not find his, and at the time of trial a copy could not be located in Memorial Hospitals' files.

Dr. Abadir testified he recalled his report stated the rate of complications in the charts he reviewed was acceptable, and he did not remember saying anything about a high complication rate in young, healthy patients. Dr. Abadir recalled his report did indicate he identified two complications in cases involving young people. However, he testified he found these complications were acceptable. At one time Dr. Abadir had been a member of the California Society of Anesthesiologists (CSA), but was not sure if he was still a member when he conducted the review at Memorial Hospitals.

Dr. Shouse testified he recalled Dr. Abadir's report stated he had found a high complication rate in young, healthy patients. However, the report did

not specifically identify Drs. Major and Turner as the anesthesiologists whose charts were reviewed, and did not single out either doctor for criticism. At a meeting of the ad hoc committee, it was reported that Dr. Abadir's review had found a higher than expected rate of complications in young, healthy patients, and that one of the doctors to whom this finding applied was Dr. Major. On July 24, 1990, Dr. Shouse reported to the MEC that an outside consultant performed a retrospective chart review and concluded there was a possible quality problem, particularly a high complication rate in young, healthy patients. It was noted that two unidentified anesthesiologists were found to have higher than acceptable rates of complication.

On August 8, 1990, Dr. Major requested all anesthesiologists in the department attend a meeting to discuss the potential impact of closure of the department. No one attended the meeting except him. On December 3, 1990, Dr. Bibi reported to the board of directors that the MEC had discussed whether the anesthesiology department should be open or closed. On March 20, 1991, Dr. Major sent a letter to William Piche, the chief executive officer of Memorial Hospital. He acknowledged the problems in the anesthesiology department, expressing frustration with his inability to solve them, and recommending closure of the department on a trial basis as a possible solution. Dr. Major felt the problems applied to both independent and Gould anesthesiologists. Although he was chairman of the department, Dr. Major had no authority to enforce any standards or rules. In fact, on one occasion when Dr. Major attempted to counsel an anesthesiologist, the doctor said to him: "What are you going to do? Fire me?"

On March 21, 1991, at an MEC meeting, Dr. Bibi voiced concern over problems in the anesthesiology department, including quality issues and inappropriate behavior. He reported that several attempts had been made to resolve disagreements within the department without success, and stated that a long-term resolution was needed. At this same meeting Carolyn Quick, vice-president of nursing at Memorial Hospitals, presented a summary of problems in the anesthesia department of which she was aware. These included: Dr. Turner's problems with an OR nurse; his conflict and shouting match with a surgeon; Dr. Turner's argument with Dr. Freeman in the presence of an awake patient; Dr. Turner's failure to respond to a call for an immediate cesarean section because he was in Oakland; Dr. Major's failure to respond to a call; Dr. Freeman's failure to show for a scheduled surgery because of a misunderstanding in the vacation schedule; Dr. Turner's failure to comply with the requirements of narcotics documentation; and the practice of the independent anesthesiologists to disparage each other in the presence of staff and patients creating tension in the OR staff to the point that some were considering resignation.

After the statements by Dr. Bibi and Carolyn Quick, Dr. Charles Stitt, an independent physician, stated he believed closure of the anesthesiology department would be beneficial. The minutes of this meeting indicate Dr. Edward Kody, another independent physician, recommended the administration of Memorial Hospitals look into closing the anesthesiology department and develop a mechanism for the procedure. The motion was passed. At trial, Dr. Kody testified he did not believe his comment was a recommendation to close the department, only a suggestion that it be considered as one alternative to solving the problems that were being experienced. Dr. Joseph Skokan, a Gould physician and chief of staff-elect in March 1991, testified it was his impression that on March 21, 1991, the MEC voted to recommend closure of the anesthesiology department.

On March 22, 1991, at a staff meeting attended by Drs. Major, Freeman, and Turner, the anesthesiologists were informed the MEC had recommended Memorial Hospitals investigate the possibility of closing the department. On April 23, 1991, Benn briefed the new members of the MEC on events leading up to the closure recommendation. Benn informed the members of the MEC that the process would begin with a solicitation of requests for proposal (RFP). The minutes of this meeting reflect the MEC supported the proposal which would be referred to the board of directors. Dr. Skokan testified that although the MEC did not specifically recommend closure of the anesthesiology department on April 23d, the recommendation to begin the RFP process was tantamount to such a recommendation.

On April 25, 1991, at a meeting attended by Drs. Major and Freeman, Dr. Eugene Sucha, a Gould anesthesiologist and new chairman of the anesthesiology department, informed the anesthesiologists that the MEC had been discussing closure of the department and that RFP's would be available to interested doctors. On May 6, 1991, Benn reported to the board of directors that the MEC had requested the administration develop a mechanism for closure of the anesthesiology department. There was no formal action by the board to approve issuance of an RFP and the board did not instruct the administration to prepare and distribute one. On June 20, 1991, copies of the RFP were mailed to numerous individuals and entities including all the anesthesiologists in Stanislaus County.

On June 25, 1991, Benn reported to the MEC that RFP's had been mailed to interested parties. Benn stated that closure would apply to all anesthesiologists, without exception. On June 28, 1991, at a staff meeting attended by Drs. Major, Freeman, and Turner, the anesthesiologists were informed that RFP's had been mailed out. On September 9, 1991, the MEC appointed a subcommittee to evaluate the seven responses to the RFP that had been

received. Among the members of the subcommittee were Drs. Skokan, Shouse, Piskun, and Stitt. One response was from Dr. Major. On September 27, 1991, at a staff meeting attended by Drs. Freeman and Turner, the anesthesiologists were informed that an RFP subcommittee had been appointed. On October 25, 1991, at a staff meeting attended by Drs. Major, Freeman, and Turner, the anesthesiologists were advised that seven responses to the RFP had been received by the subcommittee. They were also told the names of the subcommittee members.

On February 2, 1992, Benn informed the board of directors that the RFP subcommittee had met with three finalists, including Gould, Dr. Major and Premier Anesthesia. Benn reported the RFP subcommittee had been unable to resolve some problems and recommended the board establish another subcommittee to help conclude the process.

After interviewing all three candidates, the RFP subcommittee considered Gould the best candidate and entered into negotiations with it on the exact terms of the contract to provide anesthesia services to Memorial Hospitals. Gould's response to the RFP called for six Gould anesthesiologists and four independent anesthesiologists who would subcontract with Gould, but would be selected by Memorial Hospitals. Memorial Hospitals rejected this provision, insisting that Gould be responsible for selecting the independent anesthesiologists who would be offered subcontracts. The subcommittee kept the negotiations with Gould confidential and did not inform the medical staff of their progress.

On May 26, 1992, Dr. Shouse informed the MEC that the RFP subcommittee had determined Gould's proposal was in the best interest of the patients and the hospital. The minutes of this meeting indicate the MEC discussed that medical staff bylaws required input from the MEC regarding quality of care issues prior to a decision to close the department. Questions were raised regarding whether the proposed contract adequately addressed quality of care. The MEC was informed the contract included a quality assessment process and that reports would be made to the MEC on a quarterly basis. However, a copy of the proposed contract was not presented to the MEC and the committee was not aware of its specific terms. The MEC unanimously approved a recommendation to award the contract to Gould. On May 29, 1992, the professional practices committee was informed of the MEC's recommendation to award an exclusive contract to Gould to provide anesthesia services to Memorial Hospitals. This committee unanimously endorsed awarding this contract.

On June 1, 1992, Benn informed the board of directors that the RFP subcommittee recommended award of the exclusive contract to provide

anesthesia services to Gould. At this same meeting, Dr. Major made an alternative presentation to the board. He also presented a letter signed by approximately 50 surgeons supporting his proposal. Dr. Major was excused and the board discussed the contract, with Quick voicing her concern that Dr. Major's proposal would not resolve the problems in the anesthesiology department. The board unanimously approved the motion to award the contract to Gould.

On June 1, 1992, Dr. Imanaka was advised Memorial Hospitals had accepted Gould's proposal. Dr. Imanaka, identified in the Gould proposal as director of the anesthesiology department, then began putting together a subcommittee to select the independent anesthesiologists who would provide services under the contract. He sought not only anesthesiologists, but also surgeons to serve on his selection committee. Among those who agreed to serve were Dr. Shouse, Dr. Donn Fassero, a Gould surgeon, and Dr. Louis Cimino, an independent surgeon. The other members of the committee were all Gould anesthesiologists.

On July 1, 1992, Piche sent letters to Drs. Major, Freeman, and Turner advising them that Gould had been awarded the contract to provide anesthesia services for Memorial Hospitals, and effective August 1, 1992, the anesthesiology department would be operated on a closed staff basis. The letter further stated that Gould had formed a committee to select the independent anesthesiologists with whom it would subcontract and identified the members of that committee. Piche's letter advised plaintiffs to contact Dr. Imanaka for further information regarding the application process.

Also, on July 1, 1992, Memorial Hospitals signed a contract with Gould as the exclusive provider of anesthesia services for both its facilities. The contract provided that Gould could provide the required anesthesia services through its own members or through independent physicians with whom it subcontracted. The contract designated Dr. Imanaka as the director of the department. It required that any person who was to provide anesthesia services meet the requirements for membership in the medical staff of Memorial Hospitals and actually be admitted as a member. The contract established an initial requirement of ten anesthesiologists, six of whom were to be Gould providers, and four to be subcontracted providers. Gould was given the responsibility of providing the services required "by employment, contractual relationship, or other arrangement . . . ." However, the physicians or certified nurse anesthetists (CRNA) selected by Gould were subject to approval by Memorial Hospitals.

Plaintiffs submitted applications to Gould for positions as independent anesthesiologists who would provide services to Memorial Hospitals. On

July 8, 1992, Dr. Imanaka sent letters to all three plaintiffs informing them they had not been selected for one of the subcontracted positions. The committee did select five individuals, three of whom were coming directly out of residency in anesthesiology. One of the five selected, Dr. James Barnette, ultimately declined the offer. Subsequently, Gould allowed the final position to be shared by three anesthesiologists who provided anesthesia service to a group of surgeons specializing in cardiac surgery. On July 13, 1992, Piche informed the executive committee of the board of directors that the anesthesia contract had been executed, and Gould's selection committee had chosen six anesthesiologists as subcontractors, not including Drs. Freeman, Turner and Major. On July 17, 1992, Piche sent letters to each of the plaintiffs informing them that if they were not under contract with Gould to provide anesthesia services for Memorial Hospitals, their anesthesia privileges would be terminated effective at midnight on July 31, 1992.

### DISCUSSION

Any discussion of the issues raised by plaintiffs must be prefaced by a discussion of the general principles of law applicable to this case. The most important is the nature of plaintiffs' rights as physicians with staff privileges at Memorial Hospitals. ■ In *Anton v. San Antonio Community Hosp.* (1977) 19 Cal.3d 802 [140 Cal.Rptr. 442, 567 P.2d 1162], our Supreme Court held that a physician's hospital privileges constitute a property right. " 'Although the term "hospital privileges" connotes personal activity and personal rights may be incidentally involved in the exercise of these privileges, the essential nature of a qualified physician's right to use the facilities of a hospital is a property interest which directly relates to the pursuit of his livelihood.' " (*Id.* at p. 823.) The court then held: "[T]he full rights of staff membership *vest* upon appointment, subject to divestment upon periodic review only after a showing of adequate cause for such divestment in a proceeding consistent with minimal due process requirements." (*Id.* at pp. 824-825.)

■ However, a key consideration in *Anton*'s holding that a physician was entitled to minimal due process before termination of staff privileges was its determination that the action taken was adjudicative in nature. "The decision in question is clearly final and is adjudicatory rather than legislative in character." (*Anton v. San Antonio Community Hosp., supra,* 19 Cal.3d at p. 815.)

■■ The distinction between an adjudicative decision and a legislative or quasi-legislative decision is critical in resolving plaintiffs' claim for two reasons. First, the requirement of a proceeding with minimal due process

prior to termination of a physician's staff privileges is not applicable if it is the result of a quasi-legislative act by the hospital.

"If the action is legislative or quasi-legislative in nature, ' ". . . a hearing of a judicial type is not required; a hearing allowed by legislative grace is not circumscribed by the restrictions applicable to judicial or quasi judicial adversary proceedings." ' [Citation.] In a quasi-legislative proceeding there is no constitutional right to *any* hearing. [Citation.]" (*Mateo-Woodburn, supra,* 221 Cal.App.3d at p. 1183; accord, *Centeno* v. *Roseville Community Hospital* (1979) 107 Cal.App.3d 62, 71 [167 Cal.Rptr. 183]; *City of Santa Cruz* v. *Local Agency Formation Com.* (1978) 76 Cal.App.3d 381, 388 [142 Cal.Rptr. 873].) A decision is considered quasi-legislative if it is one of general application intended to address an administrative problem as a whole and not directed at specific individuals. "Generally speaking, a legislative action is the formulation of a rule to be applied to all future cases, while an adjudicatory act involves the actual application of such a rule to a specific set of existing facts." (*Strumsky* v. *San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 35, fn. 2 [112 Cal.Rptr. 805, 520 P.2d 29]; accord, *Mateo-Woodburn, supra,* 221 Cal.App.3d at p. 1184; *Redding* v. *St. Francis Medical Center* (1989) 208 Cal.App.3d 98, 103-105 [255 Cal.Rptr. 806].)

█ █ Second, characterization of a decision as either adjudicative or quasi-legislative has a significant impact on the applicable standard of review. If the decision resulting in the deprivation of a physician's staff privileges is adjudicative, we review whether the physician was afforded due process. A claim that due process rights have been violated is reviewed de novo. (*U.S.* v. *Hamilton* (6th Cir. 1997) 128 F.3d 996; *U.S.* v. *Lloyd* (6th Cir. 1993) 10 F.3d 1197, 1216, cert. den. 513 U.S. 883 [115 S.Ct. 219, 130 L.Ed.2d 147]; *U.S.* v. *Hernandez* (9th Cir. 1991) 937 F.2d 1490, 1493; see *State of Ohio* v. *Barron* (1997) 52 Cal.App.4th 62, 67 [60 Cal.Rptr.2d 342] [constitutional issues are generally reviewed de novo].) On the other hand, if the decision is quasi-legislative, we apply a much more deferential standard of review. "As to the quasi-legislative acts of administrative agencies, 'judicial review is limited to an examination of the proceedings before the officer to determine whether his action has been arbitrary, capricious, or entirely lacking in evidentiary support, or whether he has failed to follow the procedure and give the notices required by law.' [Citations.]" (*Pitts* v. *Perluss* (1962) 58 Cal.2d 824, 833 [27 Cal.Rptr. 19, 377 P.2d 83].)

This standard only requires that there be some reasonable basis for a decision in order to pass muster on review. " 'If reasonable minds may well be divided as to the wisdom of an administrative board's action, its action is

conclusive. Or, stated another way, if there appears to be some reasonable basis for the classification, a court will not *substitute its judgment* for that of the administrative body.'" (*Pitts* v. *Perluss, supra,* 58 Cal.2d at p. 835, fn. 4.) This standard is also applicable "to judicial review of rule-making or policy-making actions of a nonprofit hospital corporation." (*Lewin* v. *St. Joseph Hospital of Orange* (1978) 82 Cal.App.3d 368, 384 [146 Cal.Rptr. 892].)

Reduced to its essence, plaintiffs' argument is twofold. First, they claim the hospital's decision to close the anesthesiology department was directed specifically at them. Therefore, the decision was adjudicative and they were entitled to due process in accordance with the medical staff bylaws prior to termination of their medical staff privileges. Second, even if the decision to close the department was quasi-legislative, it was arbitrary, capricious, and did not comply with the procedures set forth in the medical staff bylaws.

It is with the above concepts firmly in mind that we evaluate plaintiffs' contentions.

I., II*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

III. *Adjudicative vs. quasi-legislative decision*

█  We now examine the heart of this legal patient: whether the decision to revoke plaintiffs' staff privileges was adjudicative or quasi-legislative. As previously stated, plaintiffs contend Memorial Hospitals' decision to close the anesthesiology department was adjudicatory because it was directed toward the exclusion of a particular physician or group of physicians. In addition to his claim of discrimination under the Unruh Civil Rights Act, Dr. Turner contends the closing process was directed at him based on allegations of his behavior problems and clinical incompetence. Citing our decision in *Mateo-Woodburn, supra,* 221 Cal.App.3d 1169, Dr. Turner argues a hospital's action is considered quasi-legislative when the action is "limited to eliminating organizational deficiencies or *systemic* quality of care concerns . . . ." However, he contends that if the decision to close a department, "reflects on the character, competency or qualifications of any *particular* physician" it is reviewable as an adjudicatory decision.

Dr. Freeman echoes Dr. Turner's argument. He contends that in order for the closing of a hospital department to be quasi-legislative, not only must the

---

*See footnote, *ante,* page 1380.

action not be directed at a specific physician or group of physicians, but there must be nothing about the process which adversely reflects on the professional qualifications of the doctors affected. Dr. Freeman argues the circumstances of the closure of the anesthesiology department at Memorial Hospitals related to allegations of his incompetence, and therefore reflected adversely on his professional qualifications. Further, he claims the fact he was not offered one of the available subcontractor positions adversely reflected on his professional qualifications. Thus, he contends the decision to close the anesthesiology department was adjudicative in nature.

Dr. Major adopts the arguments made by Drs. Turner and Freeman.

A. *Standard of review*

The trial court's findings concerning what factors, if any, were considered and motivated the decision to close the anesthesiology department are issues of fact which we review for substantial evidence. However, the court's conclusion regarding whether the action was adjudicatory or quasi-legislative is an issue of law which is reviewed de novo. (See *Lewin* v. *St. Joseph Hospital of Orange, supra,* 82 Cal.App.3d at p. 387.)

B. *Analysis*

The trial court found the decision to close the anesthesiology department "was motivated by an honest, reasonable, and factually based concern about improving the overall functioning of the entire department and in improving employee morale. . . . In short, it was made to rid the Hospital of the undesirable effects of an open department and not directed specifically [at] excluding part of the plaintiffs." It then concluded: "The action to close the Department of Anesthesia was quasi-legislative, reasonable, rational, lawful, and in conformity with public policy. It was not arbitrary, capricious, or entirely lacking in evidentiary support."

Any analysis of this issue must begin with a recognition of the right of Memorial Hospitals to make a policy decision to close the anesthesiology department, even if it affects the clinical privileges of one or more physicians. "Numerous cases recognize that the governing body of a hospital, private or public, may make a rational policy decision or adopt a rule of general application to the effect that a department under its jurisdiction shall be operated by the hospital itself through a contractual arrangement with one or more doctors to the exclusion of all other members of the medical staff except those who may be hired by the contracting doctor or doctors. [Citations.]" (*Mateo-Woodburn, supra,* 221 Cal.App.3d at p. 1183.) A decision is

quasi-legislative in nature when it is not directed toward the exclusion of particular physicians, but "undertaken as a general effort to address an administrative problem—problems within the department of anesthesiology as a whole—affecting other functions within the hospital and the overall quality of medical services." (*Id.* at p. 1184.)

The right of a hospital to take quasi-legislative action regardless of the negative impact it may have on the staff privileges of a physician or group of physicians is justified because of the overriding concern for the quality of patient care. "A hospital provides essential facilities to members of the medical community so that members of the medical community, in turn, can provide medical services to the community at large. An important public interest exists in preserving a hospital's ability to make managerial and policy determinations and to retain control over the general management of the hospital's business. A hospital is under an obligation to remedy any situation which threatens or jeopardizes patient care. [Citation.]" (*Mateo-Woodburn, supra,* 221 Cal.App.3d at pp. 1184-1185.)

An objective consideration of the evidence leads to the inescapable conclusion that there was ample evidence of systemic problems in the anesthesiology department which affected the quality of medical services at Memorial Hospitals' facilities. For approximately five years prior to closure, the problems in the anesthesiology department had been the topic of discussion and concern at various meetings throughout the hospital. The difficulties in scheduling anesthesiologists, their failure to respond in a timely manner to requests for support, and the problems locating anesthesiologists who were on call were legion. These troubles were caused in part by the shortage of available anesthesiologists. However, despite the chronic nature of this shortage, the department seemed incapable of curing it. The evidence indicated this failure may have been the result of the existing anesthesiologists being unwilling to share their workload and associated income with additional physicians.[4] This was true even though surgeries were being delayed because anesthesiologists were too fatigued to continue or complained of experiencing hallucinations.

The shortage of anesthesiologists also impacted the department's ability to provide services for other members of the medical staff, such as OB/GYN's long-standing request for epidural services. The delays in obtaining anesthesia services had reached the point that Memorial Hospitals was failing to

---

[4]Dr. Barnette testified he talked to Dr. Major about a position as an independent anesthesiologist at Memorial Hospitals in March 1989. However, his interest ended when Dr. Freeman said he would not share any cases with him. On the other hand, Dr. Major testified one of the reasons he did not bring more independent anesthesiologists into the hospital was because the Gould anesthesiologists said they wanted to pick up the extra cases.

meet the national standards for timely performance of cesarean sections. Finally, the shortage was further exacerbated by the refusal of some anesthesiologists, both independent and Gould, to provide anesthesia services in cases of cardiac surgery. As a result, this workload disproportionately fell on the remaining anesthesiologists.

The members of the anesthesiology department had also demonstrated an inability to maintain professional relations between themselves and other members of the medical staff at Memorial Hospitals. They squabbled among themselves, refused to talk to one another, and had numerous personal conflicts with surgeons. Dr. Turner was even involved in physical altercations, including at least one occasion when he punched a nurse. The anesthesiologists' practice of airing their dissatisfaction with each other in the presence of other staff members and patients impacted morale to the extent that some of the OR staff considered resigning. The personality conflicts in the anesthesiology department were not limited to plaintiffs. There was evidence of conflicts between the independent and Gould anesthesiologists as well as between Gould anesthesiologists and other physicians.

The problems in the anesthesiology department were compounded by an absence of anyone with the authority to require the anesthesiologists to resolve their problems. The department was not a cohesive, integrated organization working toward a common goal. Rather, it was a loose association of independent contractors, divided into two separate factions, independents and Gould, who did not recognize any central authority over them. The problem attendant to this organization was obvious in the narcotics documentation problem the department experienced. The fact this problem existed is not as significant as the length of time it took to solve it, even though it jeopardized Memorial Hospitals' accreditation and posed a danger that narcotics would be diverted and misused. The lack of leadership also manifested itself in the department's failure to timely address and resolve quality of care issues involving anesthesiologists.

Considering the evidence, the question that comes to mind is not whether there were systemic problems in the anesthesiology department which would justify closure of the department, but why it took Memorial Hospitals as long as it did to make this decision. The department can most aptly be described as dysfunctional to the extent it jeopardized the overall quality of patient care at Memorial Hospitals.

It was the overall problems associated with the operation of the department that motivated the closure decision rather than an intent to specifically exclude plaintiffs. Undoubtedly, plaintiffs' conduct contributed to the systemic troubles of the department. However, the mere fact the overall problems considered in the closure decision included the individual difficulties

plaintiffs created, does not mandate a finding that the decision was directed at them. It is axiomatic that the whole is the sum of its parts. A systemic problem is nothing more than the aggregation of a number of individual problems. Although plaintiffs' conduct accounted for a disproportionate share of the anesthesiology department's problem, it did not account for *all* of them. Additionally, Memorial Hospitals' decision to close the department was directed not just at solving the existing problems, but also to creating an organization capable of effectively dealing with similar issues in the future.

Moreover, the committees which considered, recommended, and authorized closure of the department were focusing on the systemic and organization problems rather than on the exclusion of any particular physician or group of physicians. Undoubtedly, plaintiffs' names came up in the course of discussing the troubles within the department, but no one testified there was any discussion of excluding them as the objective of the closure. Rather, the evidence indicates the overriding concern was for the overall quality of care provided by the anesthesiology department and the fact the troubles it was experiencing seemed to be getting worse over time. In fact, Dr. Major had recommended that closure of the department should be considered as a means of solving the organizational and quality issues it was experiencing and which he had been unable to correct. Therefore, the evidence was sufficient to support the trial court's finding that the decision to close the department was not directed at excluding plaintiffs.

Plaintiffs argue that even if Memorial Hospitals' decision to close was not directed at them, it cannot be characterized as quasi-legislative if the hospital's decision is a de facto adverse reflection on their character, competency or qualifications. Plaintiffs contend Memorial Hospitals' decision to close the anesthesiology department, coupled with its failure to require Gould to offer them subcontracts which resulted in their replacement by other anesthesiologists, constituted such a de facto decision. Therefore, it must be adjudicatory in nature. Put simply, plaintiffs contend the fact they were deprived of their staff privileges as a result of Memorial Hospitals' decision to close the anesthesiology department is evidence that eliminating them was the purpose of the action.

Plaintiffs cite several cases which they claim support their argument, the primary one being our decision in *Mateo-Woodburn, supra*, 221 Cal.App.3d 1169. Although *Mateo-Woodburn* involved facts very similar to those in plaintiffs' case, it does not stand for the proposition attributed to it by plaintiffs.

In *Mateo-Woodburn*, the defendant decided to change the system of delivery of anesthesia services at the hospital from an open staff to a

closed system. (*Mateo-Woodburn, supra,* 221 Cal.App.3d at p. 1175.) The decision was made because of problems the hospital was having with administration of the open staff system that presented a real risk to patients and affected the morale of the department and support staff. (*Id.* at pp. 1177-1178.) Prior to making the final decision to go to a closed system, the hospital scheduled a noticed hearing at which physicians, including the plaintiff, were allowed to make comments. (*Id.* at pp. 1178-1179.) After the hearing, the plaintiff made a counterproposal to the board of trustees which was rejected. The board then decided the department would be closed upon appointment of a permanent director. (*Id.* at p. 1179.)

After the director was appointed, all the anesthesiologists with privileges were notified that unless they entered into a contract with the director with whom defendant had a contract, they would not be permitted to practice in the hospital. The contract with the director provided that he was the exclusive provider of clinical anesthesiology services at the hospital; provided for the minimum qualifications of any physicians with whom he contracted; and reserved for the defendant the right to review and approve the form of any contract prior to execution. (*Mateo-Woodburn, supra,* 221 Cal.App.3d at pp. 1180-1181.) Six anesthesiologists did not sign a contract with the new director. Five refused to do so, and one was not offered a contract, although he said he would not have signed the contract even if it had been offered. (*Id.* at p. 1181.)

We held the decision of the defendant hospital was quasi-legislative in nature. "Here, the policy decision by FCH to go from an open to a closed system of delivery of anesthesia services was not irrational, arbitrary, contrary to public policy or procedurally unfair. The chronic problems existing in the department under the rotation system adversely affected the efficient delivery of anesthesia services to patients, lowered the quality of patient care, and created a potential risk to patients which included the risk of paralysis and/or death. The defects, including the lack of leadership, control and discipline in the system, were patent. Contrary to plaintiffs' argument the hospital was not required to wait until serious consequences occurred before taking action." (*Mateo-Woodburn, supra,* 221 Cal.App.3d at p. 1184.)

We explained the distinction between an adjudicatory and a quasi-legislative decision on the reputation of a physician. "[W]here a doctor loses or does not attain staff privileges because of professional inadequacy or misconduct, the professional reputation of that doctor is at stake. In that circumstance, his or her ability to become a member of the staff at other

hospitals is severely impaired. On the other hand, a doctor's elimination by reason of a departmental reorganization and his failure to sign a contract does not reflect upon the doctor's professional qualifications and should not affect his opportunities to obtain other employment." (*Mateo-Woodburn*, 221 Cal.App.3d at p. 1185.)

Plaintiffs claim the phrase "and his failure to sign a contract," in the *Mateo-Woodburn* decision indicates our holding was "premised upon the assumption that all doctors in the department will have the opportunity to stay on under the closed system, provided that a sufficient number of positions exist." Based on this assumption, plaintiffs conclude that if a hospital does not require the contractor to offer subcontracts to the incumbent physicians when a department is closed, it is a decision which de facto reflects on their character, competency or qualifications. Thus, coming full circle, the initial decision to close the department must be deemed to have been adjudicatory. We reject plaintiffs' exercise in circuitous logic for several reasons.

First, notwithstanding the phrase in *Mateo-Woodburn*, referring to the fact the plaintiffs' professional qualifications were not called into question when they refused to sign a subcontract offered to them, one of the plaintiffs there was *not* offered a subcontract. Our decision applied equally to him and to those physicians who were offered but declined a subcontract.

Second, there is nothing in *Mateo-Woodburn* to suggest that a hospital has a duty to offer a subcontract to incumbent physicians upon closure of a department as a precondition to finding the decision is quasi-legislative. To the contrary, the express language we used undermines plaintiffs' contention. "Thus, the vested rights of a staff doctor in an adjudicatory one-on-one setting, wherein the doctor's professional or ethical qualifications for staff privileges is in question, take on a different quality and character when considered in light of a rational, justified policy decision by a hospital to reorganize the method of delivery of certain medical services, *even though the structural change results in the exclusion of certain doctors from the operating rooms*. If the justification is sufficient, the doctor's vested rights must give way to public and patient interest in improving the quality of medical services." (*Mateo-Woodburn, supra,* 221 Cal.App.3d at p. 1185, italics added.)

Considering this language, it is difficult to understand how plaintiffs find support for their argument in *Mateo-Woodburn*. However, to the extent the decision could be read to require that subcontracts be offered to incumbent physicians as a precondition to finding the decision to close a department is

quasi-legislative, we expressly reject that interpretation. Further, plaintiffs can find no support for their contention in any of the other cases which have considered the closure of a department in a hospital.

In *Blank* v. *Palo Alto-Stanford Hospital Center* (1965) 234 Cal.App.2d 377 [44 Cal.Rptr. 572], the defendant had an exclusive contract with a partnership of radiologists to provide radiological services for the hospital. The plaintiff was a physician and member of the hospital staff who was excluded from the facilities of the radiology department. The plaintiff brought suit seeking damages and injunctive relief. Following trial, the court found against the plaintiff. (*Id.* at pp. 379-382.) In affirming the trial court, the appellate court focused on the justification for the action and noted that evidence of practice among hospitals is relevant to the issue. (*Id.* at p. 385.) The court also recognized that a hospital may legitimately exclude some physicians from certain departments: "Although it may be assumed that a public, and for purposes of this case, a private hospital may not unreasonably or arbitrarily exclude a physician otherwise qualified from membership on its staff . . . , it does not necessarily follow that it may not provide by regulation, or otherwise, that certain facilities shall be operated by the hospital itself to the exclusion of all members of the staff except those who may be coincidentally employed in such operation." (*Id.* at pp. 385-386.)

Ultimately, the court concluded the evidence supported the findings of the trial court and that the radiology department was established as a closed staff system in a reasonable manner. "Any exclusion of appellant is not as a matter of law unreasonable or arbitrary, but is justifiable in view of the ends to be accomplished, nor can the contracts be attacked as illegal." (234 Cal.App.2d at p. 394.)

Plaintiffs claim *Blank* is distinguishable because there were not enough positions available in the closed radiology department to retain all the incumbents. Therefore, unlike their case, the closure of the department in *Blank* did not reflect adversely on the professional qualifications of the plaintiff who was excluded. This argument is specious. By selecting a physician other than the plaintiff, the hospital in *Blank* made a de facto decision concerning the relative merit of the two candidates just as assuredly as did Gould in selecting anesthesiologists other than plaintiffs. Further, there is nothing in *Blank* to suggest the court based its finding that closure was warranted on the fact that it did not reflect adversely on the plaintiff. To the contrary, the primary thrust is that closure was justified regardless of the negative impact it had on the physician who was excluded.

Similarly, in *Letsch* v. *Northern San Diego County Hosp. Dist.* (1966) 246 Cal.App.2d 673 [55 Cal.Rptr. 118], the defendant hospital had a contract

with the plaintiff and another physician to act as the hospital's radiologists. The board of directors made a decision to close its radiology department and terminated its agreement with the plaintiff because it entered into an agreement with the other physician to be the hospital's sole radiologist. (*Id.* at p. 675.) Relying on the reasoning in *Blank* v. *Palo Alto-Stanford Hospital Center, supra,* 234 Cal.App.2d 377, on appeal the court found the defendant was entitled to operate its radiology department as a closed staff even though it excluded the plaintiff. The court summarily rejected the plaintiff's complaint that the closed staff operation unlawfully interfered with his right and that of his patients to select a radiologist of their own choosing. "The interference resulting from the closed staff operation of which [the plaintiff] complains is reasonable." (246 Cal.App.2d at p. 677.)

Plaintiffs claim *Letsch* is also distinguishable because again there were insufficient positions available after closure of the department to offer positions to all the physicians. However, what is truly significant in *Letsch* is the fact plaintiff was *not* offered the option to be the sole radiologist providing services to the hospital when the radiology department was closed. Yet, the court had no trouble finding the closure decision was justified.

In *Lewin* v. *St. Joseph Hospital of Orange, supra,* 82 Cal.App.3d 368, the court considered the rights of a physician to practice in a closed department. In *Lewin,* the defendant's dialysis unit was operated on a closed staff basis. The plaintiff requested the defendant grant him privileges in the dialysis unit. The defendant declined to do so and elected to maintain its closed staff system. The plaintiff was afforded a hearing on the issue and made a presentation to the defendant's executive committee of the medical staff association. The committee recommended maintaining the closed staff system, and the defendant's board of trustees approved the recommendation. (*Id.* at pp. 376-380.)

Plaintiffs correctly note *Lewin* is distinguishable from their case, since it did not involve a decision by the hospital to close a department, but rather a decision to maintain a closed department. However, the case is relevant for the court's broad statement concerning the right of a hospital to close a department in spite of the impact on the practicing physicians.

"[T]here can be no doubt that, because denial of staff membership may effectively impair a physician's right fully to practice his profession, neither a private nor public hospital may unreasonably or arbitrarily exclude a physician otherwise qualified from membership on its staff. [Citations.] However, it does not necessarily follow that the governing authority of a hospital may not make a policy decision or adopt a rule of general application that certain facilities shall be operated by the hospital itself through an

arrangement with one or more physicians to the exclusion of all members of the staff except those who may be coincidentally employed in such operation. [Citation.] Indeed, in every case brought to our attention in which a hospital's operation of a facility on a 'closed-staff' basis was challenged, the decision of the governing authority of the hospital has been upheld. [Citations.]" (*Lewin* v. *St. Joseph Hospital of Orange, supra,* 82 Cal.App.3d at p. 391.)

The court went on to note the decision to continue the closed staff dialysis unit was based on evidence this system would enhance patient care, reduce cost, and facilitate administration of the hospital. These considerations were "worthy objectives advancing important social interests," and in balance were sufficient to justify the interference with the plaintiff's ability to practice medicine resulting from the closed staff system. (*Lewin* v. *St. Joseph Hospital of Orange, supra,* 82 Cal.App.3d at p. 394.)

The effect of closure of a department on the physicians involved was also considered in *Centeno* v. *Roseville Community Hospital, supra,* 107 Cal.App.3d 62. In *Centeno,* the plaintiff was a partner in a group that was granted an exclusive contract to provide radiology services to defendant hospital. The plaintiff had a falling out with the other members of the partnership and left. The defendant then refused to permit the plaintiff to use its radiology facilities because it had an exclusive contract with the remaining partners. The plaintiff sued, claiming the hospital could not deny him privileges to use the radiology facilities. (*Id.* at p. 66.) The trial court and Court of Appeal disagreed.

Plaintiffs contend *Centeno* is again distinguishable because the plaintiff in *Centeno* was excluded from the radiology department when he voluntarily left the group that had the exclusive contract with the hospital, rather than as the result of the hospital's decision to close the department. Therefore, plaintiffs argue there was nothing about the circumstances of the case which reflected adversely on the plaintiff's qualifications. However, again there is nothing in *Centeno* which suggests the outcome would have been different if the hospital's decision had met the plaintiff's definition of adverse reflection on the professional qualifications of the excluded physician. To the contrary, the court quoted the broad language of *Lewin* v. *St. Joseph Hospital of Orange, supra,* 82 Cal.App.3d 368, when it discussed the right of a hospital to close or maintain the closure of a department.

Finally, *Redding* v. *St. Francis Medical Center, supra,* 208 Cal.App.3d 98, addressed the rights of physicians who lose their staff privileges as the result of the closure of a department in a hospital. In *Redding,* the defendant hospital was concerned about the quality of heart bypass surgery at its hospital because of an unacceptably high mortality rate and other problems

very similar to those present in plaintiffs' case. As a result, the hospital decided to go from an open staffing system, to a closed program. The plaintiffs were surgeons who had performed bypass surgeries at the hospital with a very low mortality rate. The court noted "[t]he proposed change was openly discussed at St. Francis during early 1988." The decision to close the department was made in June 1988. Both plaintiffs declined to be the surgeon in charge of the new closed department, and were subsequently notified they would no longer be able to perform bypass surgery at defendant's hospital. (*Id.* at pp. 101-103.)

In upholding the trial court's determination that the defendant could close the heart bypass surgery department, the court first noted the decision in *Anton* v. *San Antonio Community Hosp., supra,* 19 Cal.3d 802, did not preclude a hospital from ever taking any action which could affect a physician's hospital privileges without an adjudicatory hearing.

"The California Courts have protected physicians from unreasonable and arbitrary exclusion from hospital staffs. . . .

". . . . . . . . . . . . . . . . . . . . . . . . .

"There is, however, a definite distinction in the case law between the intentional actions of a hospital directed specifically toward the exclusion of a particular physician or groups of physicians, and the actions of a hospital which may, as a practical matter, result in the exclusion of individual practitioners but were undertaken for less personally directed reasons. Cases in the first category have protected physicians; cases in the latter category have often balanced the equities in favor of the hospitals.

". . . . . . . . . . . . . . . . . . . . . . . . .

"Thus it may be seen that the 'property right' of a physician in hospital staff privileges is subject to protection in some contexts but not in others. . . ." (*Redding* v. *St. Francis Medical Center, supra,* 208 Cal.App.3d at pp. 103-105.)

Plaintiffs contend *Redding* is distinguishable because the two plaintiffs were extended an opportunity to be the surgeon in charge of the new closed department. Thus, there is no evidence the hospital's decision to close the heart surgery program was directed at a particular physician or group of physicians. The facts of *Redding* belie plaintiffs' argument.

First, it is significant that one of the primary reasons the defendant hospital in *Redding* considered closing its heart surgery program was a quality of care issue—an unacceptably high mortality rate. Although the plaintiffs' mortality rate was very low, some or all of the other surgeons who performed heart surgery at defendant hospital must have been experiencing

problems for the overall program to experience a higher than expected mortality rate. Yet the court had no problem finding the closure was the result of a valid policy decision (quasi-legislative) and not directed at any specific individual.

Second, although the opinion indicates both of the plaintiffs in *Redding* were offered the opportunity to be in charge of the new heart surgery program, it does not indicate they were to simultaneously occupy the position. The logical inference is that one, and then the other was offered the position. Thus, if one had accepted the position, the other would necessarily have been excluded. This fact undercuts plaintiffs' claim that *Redding* is inapposite because it involved a situation where the plaintiffs were offered a position and declined. In addition, once the plaintiffs in *Redding* declined the director position, there is no evidence they were offered a subcontract which would have allowed them to continue to practice at the hospital.

When a hospital department is going through the process of closure, the end result will be to either increase or decrease the number of physicians, or have their numbers remain the same. Regardless of the outcome, it is quite possible that any individual physician will not be offered a subcontract. In these times, when corporate change is so common, the fact an incumbent physician is not offered a subcontract by the incoming corporation does not necessarily reflect on his or her competence. In any job search where there are a limited number of positions, there can only be so many successful applicants. For the unsuccessful ones, their failure to receive an offer may not reflect *favorably* on them; however, it does not necessarily reflect *negatively*.

Plaintiffs urge us to draw a line based on how they claim some nebulous public perceives a physician, following his or her failure to be offered a subcontract after closure of a department. They claim the only situation where a hospital may legally close a department without all department members receiving subcontract offers is when the department is downsized. Apparently they believe this scenario somehow softens the impact on a physician's reputation. Simply put: plaintiffs will never be satisfied short of a complete pairing of physicians with newly created positions following closure of a department. However, a judicial pronouncement of a rule requiring a hospital to do as plaintiffs suggest smacks of court meddling in hospital administration, a strongly disfavored practice. (See *Lewin* v. *St. Joseph's Hospital of Orange, supra,* 82 Cal.App.3d at p. 385.) Plaintiffs want us to give them insurance not available to the vast majority of the working public—absolute job security. This, we decline to do.

We conclude that Memorial Hospitals' decision to close the anesthesiology department was quasi-legislative, since it was not directed at any specific physician or group of physicians. Rather, it was based on a genuine

concern about the overall function of the anesthesiology department and directed at improving the quality of patient care provided by that department. Further, we expressly reject any inference in *Mateo-Woodburn* that a hospital has a legal obligation to offer an incumbent physician a position in a closed department as a precondition to finding a closure decision is quasi-legislative rather than adjudicative.

IV. *Adequacy of the closure procedures*

Having found Memorial Hospitals' decision to close the anesthesiology department was quasi-legislative, we next consider plaintiffs' other assertions of error, which are twofold. First, they contend the procedure by which Memorial Hospitals closed the anesthesiology department was so fundamentally flawed and unfair that it did not satisfy the requirements of a valid quasi-legislative decision. Second, plaintiffs argue the trial court erred when it failed to consider the closure decision as an "integrated whole."

A. *Standard of review**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

B. *Analysis**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

1., 2*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

3. *Closure process as an "integrated whole"*

Quoting our language in *Mateo-Woodburn*,[6] plaintiffs argue the trial court erred because it failed to consider the steps in the closure of the anesthesiology department as an "integrated whole." Plaintiffs claim that in accordance with *Mateo-Woodburn*, Memorial Hospitals' legal responsibility extended to the selection of the subcontractors by Gould because the terms of the subcontracts were " 'part of the [hospital's] administrative decision.' " (*Mateo-Woodburn, supra,* 221 Cal.App.3d at p. 1187.) Plaintiffs claim the trial court did not consider the closure decision as an integrated whole, but "artificially divided" it into distinct phases. They argue the court considered the closure of the anesthesiology department in three distinct phases: Memorial Hospitals' decision to close the department; the award of the anesthesiology services contract to Gould; and the selection of subcontractors by

*See footnote, *ante*, page 1380.
[6]"The various steps involved in the process of moving from an open to a closed system cannot be segmented but are to be considered as an integrated whole." (*Mateo-Woodburn, supra,* 221 Cal.App.3d at p. 1187.)

Gould. Plaintiffs argue this procedure resulted in minimization of the impact of the irregularities in each separate phase, allowing the court to conclude the process as a whole was fair. Additionally, plaintiffs argue that somehow this procedure contributed to the trial court's failure to recognize that Memorial Hospitals had a legal duty to ensure subcontracts were offered to plaintiffs, even though Gould did not. Plaintiffs are incorrect on both counts.

Initially, we recognize plaintiffs' argument that the closure process must be considered as an integrated whole is akin to claiming it must be reviewed for cumulative error. In other words, they argue the court failed to consider the cumulative impact of problems in each phase of the overall process on the fairness of the closure decision. However, implicit in this argument is the assumption that errors occurred in each phase of the process. The only rational way to make this determination is to do exactly what the trial court did: consider each discrete step in the process separately. Having done this, the court found no error in each step of the process. Therefore, it is difficult to understand how the court could have erred in failing to consider the cumulative effect of the absence of error in each phase of the closure process on the overall decision to close the department.

Second, to the extent plaintiffs' claim that the closure decision, including the selection of subcontractors by Gould, implies the existence of a conspiracy or *sub rosa* agreement between Memorial Hospitals and Gould to exclude plaintiffs, we reject it. The trial court specifically found there was no conspiracy between Memorial Hospitals and Gould to discriminate against plaintiffs or exclude them from the anesthesiology department. *Plaintiffs have not appealed this finding and, therefore, are bound by it.*

Third, it is important to recognize the context in which we discussed the requirement to consider the closure process as an integrated whole in *Mateo-Woodburn.* The passage quoted by plaintiffs is from our discussion of the plaintiff's claim in *Mateo-Woodburn,* that the terms of the subcontracts offered them were unfair and "Draconian." (*Mateo-Woodburn, supra,* 221 Cal.App.3d at p. 1186.) Based on the fact the defendant hospital had contractually reserved the right to review and approve the form of any subcontract offered, we concluded the terms of the contract were an integral part of the closure decision. (*Id.* at p. 1187.) It was in this context that we stated the closure process was to be considered as an integrated whole. Thus, we held the terms of the subcontracts would be reviewed according to the same deferential standard as the rest of the closure process and would be upheld unless it was substantially irrational. (*Ibid.*)

However, the holding in *Mateo-Woodburn* should not be read to mean a hospital retains responsibility for every part of the subcontracting process by the contractor that receives an exclusive contract. In *Mateo-Woodburn,* we

found the terms of the subcontracts were reviewable as part of the closure process because the hospital contractually retained the right to review them as part of its contract with the contractor. However, the opinion does not state that the procedure by which the contractor decided which physicians it would offer subcontracts was reviewable by the court as an integral part of the closure decision.

Reviewing the facts in plaintiffs' case, it is apparent Memorial Hospitals attempted to extricate itself entirely from the subcontractor selection process. First, the RFP it issued did not dictate the manner in which a bidder would satisfy the requirements of the contract. It did not dictate the number of anesthesiologists, who they would be, or whether they were required to be directly employed by the bidder or independent contractors.[7] It only required the anesthesiologists who were to provide services under the contract be licensed in California, be certified or eligible for certification by the American Board of Anesthesiology, and obtain medical staff membership at Memorial Hospitals. The RFP required any bidder to list the names of proposed staff, including anyone who had agreed to enter a subcontract with the bidder in the event it was awarded the contract. However, the only specified criteria which Memorial Hospitals stated was required was board certification or board eligibility.

There is nothing in the RFP or final contract which dictates what criteria Gould had to use in selecting subcontractors or direct employees, or the manner in which they should be selected.[8] Further, Memorial Hospitals rejected Gould's initial proposal which would have required Memorial Hospitals to select the independent anesthesiologists who would be offered subcontracts under its proposal. Gould was specifically required to take responsibility for selecting the independent anesthesiologists with whom it would subcontract. Moreover, the evidence supports the trial court's finding that after award of the contract to Gould, Memorial Hospitals did not direct to whom Gould should or should not offer a subcontract.

Neither did Memorial Hospitals play any part in the development of criteria used by Gould in selecting subcontractors or suggest who the

---

[7]The final contract did provide that anesthesia services would initially be provided by six Gould anesthesiologists and four independent anesthesiologists. However, this provision was not mandated by the RFP, but rather as the result of Gould's proposal.

[8]The final contract did provide that any anesthesiologist or nurse anesthetist who was to provide anesthesia services had to be approved in writing by Memorial Hospitals. However, this provision was not limited to anesthesiologists with whom Gould entered subcontracts, but to *anyone* who would provide anesthesia services under the contract. Thus, this provision cannot reasonably be interpreted as an attempt by Memorial Hospitals to control the procedure or criteria by which Gould selected the independent anesthesiologists. Rather, considering the contract as whole, the provision is reasonably construed to be a means by which Memorial Hospitals ensured that anyone who was to provide anesthesia services under the contract met the general requirements set forth in other provisions of the contract, e.g., medical staff membership, licensure, and board certification or eligibility.

members of the subcontractor selection committee should be. When Gould sought advice on how to select subcontractors, Memorial Hospitals suggested the selection process should be objective and open to all current members of the anesthesiology department. The criteria for selection of the subcontractors was developed by Dr. Imanaka after discussion with members of the selection committee. After the members of the selection committee scored each candidate individually, it was Dr. Imanaka who compiled the total scores and decided how to rank the applicants. Memorial Hospitals played no part in this process and there is no evidence it ever saw the completed score sheets. The only apparent connection between the subcontractor selection committee and Memorial Hospitals was that it allowed the committee to meet in its facility. Thus, there was sufficient evidence to support the trial court's finding that the subcontractor selection committee did not act on behalf of Memorial Hospitals.

Based on the express terms of the RFP and the evidence presented at trial, we conclude that review of Memorial Hospitals' quasi-legislative decision to close the anesthesiology department does not include the process by which Gould selected the subcontractors. That does not mean this process is immune from review. However, this review is much more circumscribed. The court's role in reviewing an employment decision is limited to determining whether it was based on unlawful criteria: "[T]he employer has discretion to choose among equally qualified candidates, provided the decision is not based upon unlawful criteria. The fact that a court may think that the employer misjudged the qualifications of the applicants does not in itself expose him to . . . liability, although this may be probative of whether the employer's reasons are pretexts for discrimination." (*Texas Dept. of Community Affairs* v. *Burdine* (1981) 450 U.S. 248, 259 [101 S.Ct. 1089, 1097, 67 L.Ed.2d 207].)

The trial court's characterization of the scoring process used by Gould to select the subcontractors as "a very erratic process" is accurate. There were wide variations in the scores plaintiffs received from the members of the selection committee on criteria which appear to be subject to very objective assessment, i.e., board certification or eligibility. The scores received by plaintiffs in the area of experience were little different from the scores received by applicants who had just completed their residency in anesthesiology. Dr. Imanaka filled out the score sheet of one member of the committee who was absent without his knowledge and contrary to his wishes. Also, one member gave plaintiffs maximum scores and all other applicants minimum scores as a protest to how the selection process was conducted.

In addition to the discrepancies in the selection process, plaintiffs highlight the personal animosity of Dr. Imanaka and other members of the

selection committee toward them, and Dr. Imanaka's incorrect statement to the selection committee that a CSA review had found plaintiffs' work to be substandard. There is no question the selection process was not a model of consistency and could have been done better or differently. However, it is not the role of a reviewing court to question the wisdom of an employment decision. "[T]he factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent. [Citations.]" (*Fuentes* v. *Perskie* (3d Cir. 1994) 32 F.3d 759, 765.)

The evidence does not support a conclusion that plaintiffs were not selected as subcontractors based on consideration of unlawful criteria. As explained earlier, plaintiffs have failed to establish that any action taken by either Memorial Hospitals or Gould was motivated by racial animus against Dr. Turner. Neither have they identified any other unlawful criteria used by Gould in its decision to not offer them subcontracts. Therefore, plaintiffs' claim that the subcontractor selection process improperly excluded them is without merit.

V.-VII.*

. . . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

The judgment is affirmed. Costs are awarded to Gould and to Memorial Hospitals on the appeal. Costs are awarded to plaintiffs on the cross-appeal as against Memorial Hospitals only.

Dibiaso, Acting P. J., and Harris, J., concurred.

The petition of plaintiffs and appellants for review by the Supreme Court was denied July 28, 1999.

---

*See footnote, *ante*, page 1380.