[Nos. F008041, F008342. Fifth Dist. June 28, 1990.]

CYNTHIA MATEO-WOODBURN et al., Plaintiffs and Appellants,
v.
FRESNO COMMUNITY HOSPITAL AND MEDICAL CENTER et
al., Defendants and Appellants;
WILLIAM H. HASS, Defendant and Respondent.

[Opinion certified for partial publication.†]

---

† Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication
with the exception of parts II and III.

1172

COUNSEL

Thomas Snell, Jamison, Russell & Asperger, Samuel C. Palmer III, Steven M. McClean, David M. Gilmore and Scott R. Shewan for Plaintiffs and Appellants.

Stammer, McKnight, Barnum & Bailey and Daniel O. Jamison for Defendants and Appellants.

Kimble, MacMichael & Upton, Jon Wallace Upton, D. Tyler Tharpe and Beth M. Stratton for Defendant and Respondent.

OPINION

**BROWN (G. A.), J.\*—** ■ Plaintiffs, five medical doctors[1] specializing in anesthesiology, appeal from a judgment of the superior court denying a permanent injunction and dissolving a preliminary injunction[2] against de-

---

\*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.

[1] There were six plaintiffs in the trial court: Cynthia Mateo-Woodburn, M.D., Richard Woodburn, M.D., Baldev David Singh, M.D., Edwin A. McDonald, M.D., Karen Shreyer, M.D., and R. Forrest Allred, M.D. Plaintiff Edwin A. McDonald, M.D., dismissed his appeal. The five remaining doctors are before us on appeal.

[2] The trial court also denied plaintiffs' request for a writ of mandate and decided the issues on plaintiffs' cause of action for declaratory relief against them. The original appeal was from

fendants Fresno Community Hospital and Medical Center, a nonprofit corporation (FCH); William H. Hass, M.D., individually and as a professional corporation (Hass); James D. Helzer (Helzer); Bryan M. Ballard (Ballard); and Community Hospitals of Central California, a nonprofit corporation. Plaintiffs also appeal from the award of costs to defendants. FCH filed a cross-appeal from an order which taxed costs and disallowed certain other costs for preparation of certain administrative records of FCH and production of other documents at trial. The appeals have been consolidated for disposition. We will affirm.

This case arises out of a decision by the FCH board of trustees to alter the system of delivery of anesthesia services at the hospital from a rotating "open staff" to a "closed" system. Under the closed system, the hospital contracted with defendant Hass to deliver all anesthesia services to the hospital through subcontractual arrangements with individual anesthesiologists. Plaintiffs herein refused[3] to sign the contract offered by Hass, claiming it deprived them of fundamental vested rights to practice their profession incident to their staff membership at FCH. The "closed" staff system was to be implemented on August 1, 1985.[4]

## FACTS

FCH is a nonprofit corporation. It is owned by Community Hospitals of Central California, a nonprofit corporation. Defendant Helzer is the president and chief executive officer of FCH and defendant Ballard is the vice-president and operating officer.

The medical staff of FCH is governed by its own bylaws, which are formulated by the physicians and thereafter approved by the board of trustees, the governing body of FCH. Under these bylaws, the medical staff elects its own officers and elects and appoints its own committees. Although appointment to membership on the medical staff is made by the board of trustees, it is based on the recommendation of the medical staff executive committee after review by the credentials committee. In short, to obtain

the whole judgment. This court on its own motion dismissed the appeal as to the causes of action for declaratory relief and writ of mandamus on the basis of the one final judgment rule since several causes of action for damages remained untried in the trial court. (*Armstrong Petroleum Corp.* v. *Superior Court* (1981) 114 Cal.App.3d 732, 737 [170 Cal.Rptr. 767].) The judgment denying injunctive relief remains before us because it is separately appealable. (Code Civ. Proc., § 904.1, subd. (f).)

[3] Plaintiff Woodburn was not offered a contract. However, he testified he would not have signed a contract had he been offered the opportunity to do so.

[4] The effective date was postponed by the operation of a preliminary injunction until November 26, 1986, the date the preliminary injunction was dissolved.

membership on the medical staff, a physician must be licensed and qualified, and such qualifications must be reviewed and approved by the medical staff physicians. The board of trustees cannot appoint physicians to the medical staff unless such physicians comply with all qualifications established in the medical staff bylaws. Further, under the bylaws, medical staff membership cannot be arbitrarily withheld or terminated without cause.

The executive committee of the medical staff coordinates the activities and general policies of the various medical staff departments; acts for the staff as a whole; receives and acts on reports of committees; enforces the medical staff bylaws, rules and regulations; directs the peer review program; and recommends to the board of trustees any disciplinary action to be taken with respect to a staff member's privileges.

Each plaintiff was a member of the medical staff. After the August 1, 1985, change from an open to a closed system, each plaintiff retained his or her membership status, but except for the preliminary injunction, lost access to the hospital's operating rooms by refusing to sign the contract offered by Hass.

Prior to August 1, 1985, and as early as 1970, the FCH department of anesthesiology operated as an open-staff. The department was composed of anesthesiologists who were independently competing entrepreneurs with medical staff privileges in anesthesiology. Collectively, the anesthesiologists were responsible for scheduling themselves for the coverage of regularly scheduled, urgent and emergency surgeries. The anesthesiologists collectively established a "rotation" system. Pursuant to this system, each anesthesiologist was given, on a rotational basis, priority in choosing his or her workload.

More specifically, each anesthesiologist was rotated, on a daily basis, through a first-pick, second-pick, etc., sequence whereby each anesthesiologist chose a particular operating room for that particular date. Usually no work was available for one or more anesthesiologists at the end of the rotation schedule. Once an anesthesiologist rotated through first-pick, he or she went to the end of the line. In scheduling themselves, the anesthesiologists established a system that permitted each anesthesiologist on a rotating basis to have the "pick" of the cases. This usually resulted in the "first-pick" physician taking what appeared to be the most lucrative cases available for that day.

The rotation system encouraged many inherent and chronic vices. For example, even though members of the department varied in their individual

abilities, interests, skills, qualifications and experience, often "first-picks" were more consistent with economic advantage than with the individual abilities of the physician exercising his or her "first-pick" option. At times, anesthesiologists refused to provide care for government subsidized patients, allegedly due to economic motivations.

The department chairman had the authority to suggest to fellow physicians that they only take cases for which they were well qualified. However, the chairman was powerless to override the rotation system in order to enforce these recommendations.

This lack of internal quality control presented a real and unnecessary risk to patients. For example, plaintiff Allred admitted that where an anesthesiologist unqualified in ob/gyn anesthesia participates in a birthing process, this situation could result in (a) the death of the mother, (b) the death of the child, (c) the death of both, or (d) severe injury to either or both, including brain damage to the infant.

Under the open-staff rotation system, anesthesiologists rotated into an "on call" position and handled emergencies arising during off hours. This led to situations where the "on call" anesthesiologist was not qualified to handle a particular emergency and no formal mechanism was in place to ensure that alternative qualified anesthesiologists would become promptly available when needed. For example, where an "on call" physician might not be qualified to handle emergency neurosurgical procedures, the time lost in locating a suitable off-duty anesthesiologist qualified for such a procedure could mean the difference between a resulting minor weakness in the patient's right hand and a patient totally paralyzed on the right side with complete loss of speech.

The scheduling of anesthesiologists for each surgery case was much more complex than the mere assignment of anesthesiologists to operating rooms. Scheduling also required close cooperation and coordination between nurses, surgeons and anesthesiologists, often under pressure of urgent and emergency cases.

These chronic defects in the system led to delays in scheduling urgent cases because the first call and second call anesthesiologists in charge of such scheduling at times refused to speak to each other. Often, anesthesiologists, without informing the nursing staff, left the hospital or made rounds while one or more of their patients were in postanesthesia recovery. This

situation caused delays as the nurses searched for the missing anesthesiologist.[5]

The trial court found these conditions resulted in breaches of professional efficiency, severely affected the morale of the department and support staff, and impaired the safety and health of the patients. As a result of these conditions, the medical staff (not the board of trustees) initiated action resulting ultimately in the change from an "open" to a "closed" system. We recite the highlights of the processes through which this change took place.

The initial recommendation of a closed system was made by the medical staff to the board of trustees on October 12, 1983. In a resolution adopted December 14, 1983, the board authorized the administration to schedule noticed hearings for the purpose of obtaining input on the proposed closure from interested or affected individuals.

Helzer, President and chief executive officer of FCH, established an "Anesthesia Task Force" to study the proposed closure. In a subsequent memo to Helzer, dated April 6, 1984, the task force indicated it had considered four alternative methods of dealing with problems in the department of anesthesiology: (1) continuation of the status quo, i.e., independent practitioners with an elected department chairman, (2) competitive groups of anesthesiologists with an elected department chairman, (3) an appointed director of anesthesia with independent practitioners, and (4) an appointed director with subcontracted anesthesiologists, i.e., a closed staff.

The memo noted that under the third alternative—a director with independent practitioners—the director would have no power to determine who would work in the department of anesthesiology. "Any restriction or disciplinary action recommended by the director would need to go through the usual hospital staff procedure, which can be protracted." It was also noted in the memo that a director with subcontracted practitioners "would have the ability to direct their activities without following usual hospital staff procedures." The committee recommended a director with subcontracted practitioners.

At a regular meeting on April 11, 1984, the board announced a special open meeting to be held on May 1, 1984, for the purpose of conducting an

---

[5] Though the above statement of facts is largely extracted from the defendants' briefs, they are fully supported by the evidence and mimic the court's recitation in its lengthy statement of decision. Plaintiffs have not contested these factual statements and in fact, state in their reply brief, "they are not in a position to challenge the sufficiency of the evidence," and are only challenging "the errors of law committed by the trial court."

officially noticed hearing on the recommendation of the medical staff executive committee that the department of anesthesiology be closed. A notice of the May 1, 1984, meeting was sent to all members of the medical staff on April 16, 1984, inviting comments from interested persons.

The meeting was held on May 1, 1984. Fifteen physicians made comments at the meeting, including plaintiff Mateo-Woodburn. Four of the six plaintiffs (five on appeal) were in attendance at the meeting. The task force memo quoted above and received by the board was presented during the meeting, almost word for word. No decision was made by the board at the May 1 meeting.

On May 9, 1984, at a meeting of the board of trustees, Mateo-Woodburn presented a counterproposal to the recommended closure of the department. The counterproposal envisioned appointment of a director of the department and contractual agreements, signed by all existing department members, to abide by the director's established policies and procedures.

After discussion, the board rejected the counterproposal and authorized the formation of a search committee to recruit a director for the department of anesthesiology. The board also determined that upon appointment of a permanent director, the department would be closed.

Mateo-Woodburn was offered the position of interim director on June 13, 1984, which position she accepted. Mateo-Woodburn was interviewed for the position of director on September 25, 1984. Hass was interviewed for the position on March 7, 1985.

At a special meeting of the board of trustees held on April 10, 1985, the anesthesia search committee recommended to the board that Hass be hired as director of the department of anesthesiology, and the recommendation was accepted by the board.

At the same April 10 meeting, the board authorized its executive committee to close the department of anesthesiology. On the same day, the executive committee met and ordered the department closed. The order was to become operative as of the effective date of the agreement to be entered into with the new director of the department. The resolution of the executive committee specifically stated: "RESOLVED: In order to ensure the desired standards of patient care, the Fresno Community Hospital and Medical Center Executive Committee, as authorized by the Fresno Community Hospital and Medical Center Board of Trustees, directs that the Department of Anesthesia at Fresno Community Hospital and Medical Center

shall be operated as a closed department under the administration, supervision, and management of a medical director. This resolution shall become operative upon the effective date of the agreement with the medical director. Thereafter, anesthesia services shall be provided only by those medical personnel selected and authorized by the medical director."

An agreement between FCH and the Hass corporation was entered into on June 7, 1985. On June 18, 1985, Helzer sent a letter to all members of the department of anesthesiology which states in relevant part: "For some months you have been aware of the expressed intention and plan of Fresno Community Hospital and Medical Center to close the Department of Anesthesia and to reorganize it under the direction of a Medical Director. Delay in implementing the plan has been experienced as a result of a search for a suitable Medical Director.

"The Board of Trustees has now entered into an agreement with William H. Hass, M.D., a professional corporation, to provide anesthesiology services for all hospital patients effective July 1, 1985. The corporation will operate the Department of Anesthesia under the direction of a Medical Director who will schedule and assign all medical personnel. The corporation has appointed Dr. Hass as Medical Director, and the hospital has concurred with the appointment. The agreement grants to the corporation the exclusive right to provide anesthesia services to all hospital patients at all times.

"To provide the services called for by the agreement, it is contemplated that the Hass Corporation will enter into contractual arrangement with individual physician associates who must obtain Medical Staff membership and privileges as required by the staff bylaws. The negotiations with such associates are presently ongoing, and the hospital does not participate in them.

"Effective August 1, 1985, if you have not entered into an approved contractual arrangement with the Hass Corporation, you will not be permitted to engage in direct patient anesthesia care in this hospital. However, at your option, you may retain your staff membership and may render professional evaluation and assessment of a patient's medical condition at the express request of the attending physician."

The contract between the Hass corporation and FCH provided that the corporation was the exclusive provider of clinical anesthesiology services at the hospital; the corporation was required to provide an adequate number of qualified physicians for this purpose; physicians were to meet specific

qualifications of licensure, medical staff membership and clinical privileges at FCH, and to have obtained at least board eligibility in anesthesiology; and the hospital had the right to review and approve the form of any contract between the corporation and any physician-associate prior to its execution.

Subject to the terms of the master contract between the Hass corporation and FCH, the corporation had the authority to select physicians with whom it would contract on terms chosen by the corporation subject to the approval of FCH. The contract offered to the anesthesiologists, among many other details, required that a contracting physician be a member of the hospital staff[6] and be board certified or board eligible. The Hass corporation was contractually responsible for all scheduling, billing and collections. Under the contract, the corporation was to pay the contracting physician in accordance with a standard fee arrangement. The contracting physician was required to limit his or her professional practice to FCH except as otherwise approved by the FCH board of trustees.

The contract was for a one-year term subject to termination on sixty days' notice by either party. It further stated: ". . . Provider shall not be entitled to any of the hearing rights provided in the Medical Staff Bylaws of the Hospital and Provider hereby waives any such hearing rights that Provider may have. However, the termination of this Agreement shall not affect Provider's Medical Staff membership or clinical privileges at the Hospital other than the privilege to provide anesthesiology services at the Hospital."

Seven of the thirteen anesthesiologists on rotation during July 1985 signed the contract. Of the six plaintiffs in this case, five refused to sign the contract offered to them. The sixth plaintiff, Dr. Woodburn, was not offered a contract but, as has been stated, testified he would not have signed it, had one been offered.

Dr. Lars Bjorkman, who was hired as the assistant director of the department, signed a contract, the terms of which were the same as the other contracts except it was for a period of four years and without a sixty-day termination provision.

In addition, as of the date of trial on April 6, 1986, a group of five highly specialized cardiac anesthesiologists who practiced at Valley Childrens Hospital, had not signed a contract with the Hass corporation, though negotiations were in progress.

---

[6] At the request of the attending physician, a nonsigning anesthesiologist could do anesthesia consultation, standby, and monitoring.

Some of the reasons given for refusal to sign the contract were: (1) the contract required the plaintiffs to give up their vested and fundamental rights to practice at FCH; (2) the 60-day termination clause contained no provisions for due process review; (3) the contract failed to specify amounts to be taken out of pooled income for administrative costs; (4) the contract required plaintiffs to change medical malpractice carriers; (5) the contract required plaintiffs to obtain permission to practice any place other than FCH; (6) the contract imposed an unreasonable control over plaintiffs' financial and professional lives; and (7) the contract failed to provide tenure of employment. The Hass corporation refused to negotiate any of the terms of the contract with plaintiffs.

## DISCUSSION

### PART I

Relying on *Anton v. San Antonio Community Hospital* (1977) 19 Cal.3d 802 [140 Cal.Rptr. 442, 567 P.2d 1162], and its progeny, the central thrust of plaintiffs' thesis is they were deprived of their fundamental and vested right to practice anesthesiology at FCH without a noticed hearing at which evidence was taken and an adjudication was made. As a result, they argue, the right to practice their profession guaranteed to them by the bylaws as members of the staff of FCH was taken without due process of law.

*Anton* involved a doctor's petition for writ of mandate to be readmitted to staff privileges at a hospital. He received notice and a formal hearing before a committee of the hospital staff, and the committee's decision was approved by the board of directors. In affirming, the trial court applied the substantial evidence test. The reviewing court held because the decision substantially affects a fundamental vested right—the right to use hospital facilities to earn a living—the trial court should have applied the independent judgment test enunciated in *Strumsky v. San Diego County Employees Retirement Association* (1974) 11 Cal.3d 28 [112 Cal.Rptr. 805, 520 P.2d 29]. The court remanded for reconsideration and application of that test.

In arriving at its decision the *Anton* court expressly held the proceedings below were adjudicatory as opposed to legislative or administrative in nature, and because the proceeding was adjudicatory, a noticed hearing for the purpose of taking evidence was required. The court further held the proper vehicle for review of "administrative decisions of an adjudicatory nature" is Code of Civil Procedure section 1094.5.

■ The distinction between "legislative," "quasi-legislative" or "administrative" action by a board or agency on the one hand and "adjudicatory"

or "quasi-judicial" action on the other hand, is critical to this litigation. *Anton*, quoting from *Strumsky* v. *San Diego County Employees Retirement Association, supra*, 11 Cal.3d at page 35, footnote 2, defines the distinction: " 'Generally speaking, a legislative action is the formulation of a rule to be applied to all future cases, while an adjudicatory act involves the actual application of such a rule to a specific set of existing facts.' " (*Anton* v. *San Antonio Community Hosp., supra*, 19 Cal.3d at p. 814, fn. 9.)

If the action is legislative or quasi-legislative in nature, " '. . . a hearing of a judicial type is not required; a hearing allowed by legislative grace is not circumscribed by the restrictions applicable to judicial or quasi judicial adversary proceedings.' " (*City of Santa Cruz* v. *Local Agency Formation Com.* (1978) 76 Cal.App.3d 381, 388 [142 Cal.Rptr. 873].) In a quasi-legislative proceeding there is no constitutional right to *any* hearing. (*Ibid.*)

■ Further, a court will not set aside a quasi-legislative or administrative decision of a nonadjudicatory nature "unless it is substantively irrational, unlawful, contrary to established public policy, or procedurally unfair." (*Centeno* v. *Roseville Community Hospital* (1979) 107 Cal.App.3d 62, 73 [167 Cal.Rptr. 183]; see also *Miller* v. *Eisenhower Medical Center* (1980) 27 Cal.3d 614, 626-627 [166 Cal.Rptr. 826, 614 P.2d 258].) It follows that review is not under Code of Civil Procedure section 1094.5, nor, on judicial review, is either the substantial evidence test or independent judgment test applied. The trial court herein recognized and applied the proper test in denying relief to the plaintiffs.

Plaintiffs' briefing and arguments throughout this case confuse the above distinction between "quasi-legislative" and "adjudicatory" actions.

This is not the first time this issue in this setting has been visited by the courts of this state. ■ Numerous cases recognize that the governing body of a hospital, private or public, may make a rational policy decision or adopt a rule of general application to the effect that a department under its jurisdiction shall be operated by the hospital itself through a contractual arrangement with one or more doctors to the exclusion of all other members of the medical staff except those who may be hired by the contracting doctor or doctors. (*Redding* v. *St. Francis Medical Center* (1989) 208 Cal.App.3d 98 [255 Cal.Rptr. 806]; *Centeno* v. *Roseville Community Hospital, supra*, 107 Cal.App.3d 62; *Lewin* v. *St. Joseph Hospital of Orange* (1978) 82 Cal.App.3d 368 [146 Cal.Rptr. 892]; *Letsch* v. *Northern San Diego County Hospital* (1966) 246 Cal.App.2d 673 [55 Cal.Rptr. 118].)

"There is . . . a definite distinction in the case law between the intentional actions of a hospital directed specifically toward the exclusion of a partic-

ular physician or groups of physicians, and the actions of a hospital which may, as a practical matter, result in the exclusion of individual practitioners but were undertaken for less personally directed reasons." (*Redding* v. *St. Francis Medical Center, supra*, 208 Cal.App.3d at p. 104.)

■ The instant case is one in which the action of defendants was not directed specifically toward the exclusion of particular physicians, but was undertaken as a general effort to address an administrative problem—problems within the department of anesthesiology as a whole—affecting other functions within the hospital and the overall quality of medical services. The action was clearly quasi-legislative in nature.

■ The principle applicable here was initially stated in *Willis* v. *Santa Ana etc. Hosp. Assn.* (1962) 58 Cal.2d 806, 810 [26 Cal.Rptr. 640, 376 P.2d 568]:[7] "There is an established principle at common law that an action will lie where the right to pursue a lawful business, calling, trade, or occupation is intentionally interfered with either by unlawful means or by means otherwise lawful when there is a lack of sufficient justification. [Citations.] Whether there is justification is determined not by applying precise standards but by balancing, in the light of all the circumstances, the respective importance to society and the parties of protecting the activities interfered with on the one hand and permitting the interference on the other. [Citations.]"

■ Here, the policy decision by FCH to go from an open to a closed system of delivery of anesthesia services was not irrational, arbitrary, contrary to public policy or procedurally unfair. The chronic problems existing in the department under the rotation system adversely affected the efficient delivery of anesthesia services to patients, lowered the quality of patient care, and created a potential risk to patients which included the risk of paralysis and/or death. The defects, including the lack of leadership, control and discipline in the system, were patent. Contrary to plaintiffs' argument the hospital was not required to wait until serious consequences occurred before taking action.

A hospital provides essential facilities to members of the medical community so that members of the medical community, in turn, can provide medical services to the community at large. An important public interest exists in preserving a hospital's ability to make managerial and policy determinations and to retain control over the general management of the hospital's business. A hospital is under an obligation to remedy any situation

[7] This opinion was overruled on other grounds in *Cianci* v. *Superior Court* (1985) 40 Cal.3d 903, 925 [221 Cal.Rptr. 575, 710 P.2d 375].

which threatens or jeopardizes patient care. (*Elam* v. *College Park Hospital* (1982) 132 Cal.App.3d 332, 347 [183 Cal.Rptr. 156].)

■ Plaintiffs argue the hospital should have adopted a less stringent alternative than the one adopted. The record supports a conclusion the hospital considered various alternatives and determined the best method to solve its problems was to deliver anesthesia services through a private contract. We are in no position to disagree with that decision.

" 'A managerial decision concerning operation of the hospital made rationally and in good faith by the board to which operation of the hospital is committed by law should not be countermanded by the courts unless it clearly appears it is unlawful or will seriously injure a significant public interest. [¶] Judges are untrained and courts ill-equipped for hospital administration, and it is neither possible nor desirable for the courts to act as supervening boards of directors for every . . . hospital . . . in the state.' [Citations.] Even bias or prejudice in favor of the selected policy does not invalidate such decisions. [Citation.]" (*Centeno* v. *Roseville Community Hospital, supra*, 107 Cal.App.3d at pp. 72-73.)

■ Thus, the vested rights of a staff doctor in an adjudicatory one-on-one setting, wherein the doctor's professional or ethical qualifications for staff privileges is in question, take on a different quality and character when considered in light of a rational, justified policy decision by a hospital to reorganize the method of delivery of certain medical services, even though the structural change results in the exclusion of certain doctors from the operating rooms. If the justification is sufficient, the doctor's vested rights must give way to public and patient interest in improving the quality of medical services.

It is also noted, where a doctor loses or does not attain staff privileges because of professional inadequacy or misconduct, the professional reputation of that doctor is at stake. In that circumstance, his or her ability to become a member of the staff at other hospitals is severely impaired. On the other hand, a doctor's elimination by reason of a departmental reorganization and his failure to sign a contract does not reflect upon the doctor's professional qualifications and should not affect his opportunities to obtain other employment. The trial court correctly found the decision to close the department of anesthesiology and contract with Hass did not reflect upon the character, competency or qualifications of any particular anesthesiologist.

■ Plaintiffs contend the process employed by FCH in closing the department of anesthesiology was procedurally unfair. The argument is spe-

cious. They claim they did not receive proper notice and a hearing. Again they are confusing an adjudicatory proceeding with quasi-legislative action. As stated above, when the action is quasi-legislative, no particular notice and hearing is required. (*City of Santa Cruz* v. *Local Agency Formation Com., supra,* 76 Cal.App.3d at p. 388.)

Nevertheless, the trial court found plaintiffs were given an opportunity to respond to the proposal. The record demonstrates members of the department of anesthesiology, including plaintiffs, were aware of the proposed change and many actually participated in the committee investigations and meetings leading up to the final decision. For example, as early as October 1983, the problems were a topic of discussion at meetings of the medical staff executive committee and the board of trustees. The then chairman of the department of anesthesiology, Dr. Fischer, who was present at a board of trustees meeting held on October 12, 1983, spoke on behalf of the department. At that meeting the board of trustees tentatively decided to close the department of anesthesiology and recruit a director.

The board of trustees held a meeting on May 1, 1984, to discuss the issues surrounding the proposed closure, at which four of the six plaintiffs were present. During discussion of the proposed "closed staff" alternative at the May 1 meeting, the following statements were made by Dr. Parker Powell, chairman of the anesthesia task force: "The anesthesiologists would be members of the medical staff, but would be members of a group subcontracted to the Director. As there would be an exclusive contract between the hospital and the Director, the ability to practice anesthesia in the hospital would be limited to those anesthesiologists subcontracted to the Director. The Director would decide with whom he subcontracted and would have the ability to direct their activities without following usual hospital staff procedures."

Further, Mateo-Woodburn, as a spokesperson for the department of anesthesiology, was given an opportunity to make a counterproposal to the board of trustees on May 9, 1984. The record indicates the board considered the proposal prior to making its determination to close the department.

 Plaintiffs list numerous other contentions. Plaintiffs characterize the contract offered to them by Hass as "Draconian" because of the 60-day termination provision and requirement they waive hearing rights contained in the medical staff bylaws, as well as the requirement that permission be obtained prior to practicing at any hospital other than FCH. They also complain of the fact that Lars Bjorkman, assistant director, was offered and accepted a four-year contract with no termination clause, and the fact that

cardiac surgery anesthesiologists were allowed to enter into negotiations on a contract with different terms, while Hass refused to negotiate different terms with the plaintiffs.

Again, the substance of these arguments is gutted by properly characterizing the contracting procedure as an integral part of the quasi-legislative decision to close the department of anesthesiology. The decision encompassed not only the decision to close the staff but also the decision to contract with Hass and to contractually reserve the hospital's right and authority "to review and approve the form of any contract between the corporation and any associate [provider] for the provision of services under this agreement prior to the execution of any such contract by the corporation and the associates."

The various steps involved in the process of moving from an open to a closed system cannot be segmented but are to be considered as an integrated whole.

As such, if the hospital's policy decision to make the change is lawful, and we hold it is, then the terms of the contracts offered to the doctors were part of the administrative decision and will not be interfered with by this court unless those terms bear no rational relationship to the objects to be accomplished, i.e., if they are substantially irrational or they illegally discriminate among the various doctors.

Given the conditions existing under the open rotation method of delivering anesthesia services, including among others the lack of control of scheduling and the absence of proper discipline, we cannot say the terms of the contract were irrational, unreasonable or failed to bear a proper relationship to the object of correcting those conditions. Considered in this light, the terms are not arbitrary, capricious or irrational.

Further, the administrative decision to offer different contract terms to assistant director Lars Bjorkman, and the highly specialized cardiac anesthesiologists was amply justified by the difference in their qualifications, responsibilities and positions. (*Centeno v. Roseville Community Hospital, supra*, 107 Cal.App.3d at p. 73.)

As to the contract provision which required waiver of hearing rights set forth in the staff bylaws, as hereinabove explained, those rights do not exist under the circumstances of a quasi-legislative reorganization of a department by the board of trustees. This quasi-legislative situation is to be distinguished from a quasi-judicial proceeding against an individual doctor

grounded on unethical or unprofessional conduct or incompetency. Accordingly, the waiver did not further detract from or diminish plaintiffs' rights.

■ Plaintiffs argue the contract required them to engage in illegal fee splitting in violation of Business and Professions Code section 2282 and California Code of Regulations, title 22, section 70703. Under the contract, the Hass corporation was to do the billing and collect the fees. The corporation was to deduct administrative expenses from gross fees, and pay the balance to the providers. In *Blank* v. *Palo Alto-Stanford Hospital Center* (1965) 234 Cal.App.2d 377, 390 [44 Cal.Rptr. 572], the court held such an arrangement is not illegal so long as the portion of the fees received by the hospital or contractor is commensurate with the expenses, direct and indirect, incurred by the hospital or contractor. In the contract offered in the instant case it appears this kind of a split is contemplated. Accordingly, the contract is immune from attack in the abstract on this ground.

■ Plaintiffs contend the department of anesthesiology could not be reorganized without amending the bylaws of the medical staff in accordance with the procedure for amendment set forth therein. Closely allied to this argument is the assertion the hospital unlawfully delegated to Hass the medical staff's authority to make staff appointments.

The argument demonstrates a fundamental misconception of the nature of the quasi-legislative action taken by the hospital to eliminate organizational deficiencies repugnant to the provision of safe, efficient and high quality patient care. The hospital's action did not change the manner or procedure by which the medical staff passes upon the qualifications, competency or skills of particular doctors in accordance with medical staff bylaws as required by Business and Professions Code section 2282 and California Code of Regulations, title 22, section 70703. In fact, plaintiffs remain members of the staff and the contract requires contracting anesthesiologists to be members of the staff. Moreover, it is clear the medical staff does not appoint medical staff members—it makes recommendations to the board of trustees which then make the final medical staff membership decisions. Hass was never given authority to appoint physicians to the medical staff and never did so. Hass was merely hired to provide anesthesiology services to the hospital. His decision to contract with various anesthesiologists in order to provide those services was irrelevant to medical staff appointments except that all persons contracting with Hass were required to qualify as members of the medical staff.

We conclude the trial court's determination that the defendants' "actions were proper under the circumstances and that plaintiffs' Medical Staff privi-

leges were not unlawfully terminated, modified or curtailed" is fully supported by the evidence and is legally correct. Since there was no legal wrong, the trial court properly terminated the preliminary injunction and properly refused to issue the permanent injunction.

Parts II, III*

. . . . . . . . . . . . . . . . . . . . .

The judgment is affirmed. Costs to defendants.

Stone (W. A.), Acting P. J., and Baxter, J., concurred.

The petition of plaintiffs and appellants for review by the Supreme Court was denied September 20, 1990. Mosk, J., was of the opinion that the petition should be granted.

---

*See footnote, *ante,* page 1169.