Filed 9/18/14  Frost St. Med. Associates v. San Diego Internal Med. Group CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| FROST STREET MEDICAL ASSOCIATES, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> SAN DIEGO INTERNAL MEDICAL GROUP, et al., <br><br> Defendants and Respondents. | D063621 <br><br><br> (Super. Ct. No. 37-2010-00101456-CU-BT-CTL) |

APPEAL from judgments of the Superior Court of San Diego County, Ronald L. Styn, Judge.  Affirmed.

Sullivan, Hill, Lewin, Rez & Engel, Jenny K. Goodman; Heisner Alvarez and John R. Heisner for Plaintiff and Appellant.

Duane Morris and Keith Zakarin for Defendants and Respondents San Diego Internal Medical Group and San Diego Hospitalists, Inc.

Higgs Fletcher & Mack, John Morris, Victoria E. Fuller, William M. Low and Susan M. Hack for Defendants and Respondents Sharp HealthCare and Sharp Memorial Hospital.

Plaintiff and appellant Frost Street Medical Associates (Frost), a group of licensed California physicians who practice as hospitalists in the field of internal medicine, filed this action for damages and other relief against a hospital where its members previously practiced, defendants and respondents Sharp HealthCare and Sharp Memorial Hospital (Sharp). Frost claims Sharp and two competing medical groups, defendants and respondents San Diego Internal Medical Group (SDIMG) and its successor San Diego Hospitalists, Inc. (SDHA), participated in various forms of unfair competition.[1] Through the challenged 2010 request for proposal process (RFP), Sharp had selected SDHA from three applicant groups as the exclusive contract provider of hospitalist services for certain of its patients who were admitted to the hospital after emergency room visits (i.e., those who were otherwise "unassigned" to a designated internal medicine physician for supervision of care).

To challenge their allegedly unfair exclusion from practice as hospitalists for such "unassigned" patients at Sharp, Frost's causes of action claim that Respondents were in violation of the Cartwright Act (Bus. & Prof. Code,[2] § 16700 et seq.), and/or the Unfair Competition Law (UCL; § 17200 et seq.). Frost also alleged that Respondents' tortious acts injured it through their intentional interference with its prospective business advantage (IIPEA).

---

[1] Where appropriate, we refer to Sharp and the other respondents collectively as Respondents.

[2] All further statutory references are to the Business and Professions Code unless noted.

The operative test for whether a managerial decision by a hospital, made in a quasi-legislative capacity, must be set aside by a court is whether that decision was "substantively irrational, unlawful, contrary to established public policy, or procedurally unfair." (*Centeno v. Roseville Community Hospital* (1979) 107 Cal.App.3d 62, 73 (*Centeno*).) Claiming that Frost could not satisfy this test on any of its causes of action, Sharp brought a motion for summary judgment or summary adjudication of issues, joined by the other Respondents. (Code Civ. Proc., § 437c.) The trial court agreed, granting summary adjudication of the above three causes of action in favor of Respondents. Later, Frost dismissed without prejudice its surviving related breach of contract claim, and judgments of dismissal were entered.[3]

On appeal, Frost argues that triable issues of material fact remain about whether the RFP procedure followed in this case was substantively and procedurally flawed. Frost contends the trial court erred in concluding on "undisputed" evidence that Respondents had adequately shown (1) the Sharp decision to undertake the RFP process was justified and not irrational, and (2) the process of awarding the exclusive services contract to SDHA was a good faith exercise of managerial judgment. Instead, Frost claims its opposition sufficiently showed or raised inferences that the Sharp decision was

---

[3] Such a voluntary dismissal of a cause of action without prejudice prior to trial provides "sufficient finality as to that cause of action so as to allow appeal from a judgment disposing of the other counts." (*Kurwa v. Kislinger* (2013) 57 Cal.4th 1097, 1105-1106 [citing Code Civ. Proc., § 581, subds. (b)(1), (c)].) No issues are raised here about any agreement for future litigation that would qualify that dismissal, and the finality of the dismissal of other claims will control over this contract cause of action as well.

a sham proceeding, representing a biased and predetermined choice in favor of SDHA. (*Centeno, supra*, 107 Cal.App.3d 62, 72-73; *Blank v. Palo Alto-Stanford Hospital Center* (1965) 234 Cal.App.2d 377, 392 (*Blank*).)  Frost argues that in reaching the opposite conclusions, the trial court improperly weighed the evidence.

On de novo review, we conclude that the trial court correctly analyzed the undisputed facts on both sides and applied the appropriate test for evaluating such a quasi-legislative policy decision.  (*Major v. Memorial Hospitals Assn*. (1999) 71 Cal.App.4th 1380, 1398 (*Major*).)  We affirm the judgments and orders granting the dispositive motions in favor of Respondents.

FACTUAL AND PROCEDURAL BACKGROUND

*A.  Outline of Participants and the RFP*

From 1991 to 2011, Sharp had an emergency room call policy applicable to all its emergency patients who had to be admitted, but who lacked their own assigned primary physician.  This policy established an "ER Call List" to be used in assigning a hospitalist who had medical staff privileges at Sharp to provide such unassigned patients with in-hospital internal medicine care.  The ER Call List consisted of hospitalists who were either independent physicians or members of medical groups.  In contrast, "assigned" patients admitted to Sharp from emergency were not served by the ER Call List.  Their hospital care was arranged by their own primary physicians or groups.   Some hospitalists also maintain outpatient practices.

Historically, SDIMG physicians were on the ER Call List, as were the seven Frost physicians.  The SDIMG group was also called the Roth call group after its senior

4

physician and administrator, Dr. Kenneth Roth, one of Sharp's former chiefs of staff. Around this time (2009-2010), the Roth call group evolved into SDHA, the group to which Sharp awarded the exclusive contract.

During the latter part of the period when the ER call policy for Sharp's unassigned patients was in effect, friction at the hospital was developing among various physicians who were employed or formerly employed by SDIMG, concerning the making of assignments for the delivery of hospitalist care to unassigned patients. At times, there were logistical problems with assignments leading to delays in care. Confusion sometimes developed about which doctors were supposed to provide hospitalist coverage for those obstetrics patients who had been transferred from another Sharp facility.

Some members of Frost left the employment of SDIMG and criticized it for poor patient care, and they communicated those concerns to Sharp's chief executive officer, Tim Smith. He responded that he was considering the award of an exclusive hospitalist contract. Around the same time, some members of SDIMG had criticized the patient care provided by Frost members, making referrals about them for care review proceedings. Frost doctors believed they were being unfairly targeted.

In September 2010, Smith and the Sharp board prepared and distributed an RFP for an exclusive group hospitalist care contract. The RFP was developed in consultation with various Sharp staff committees, and it set forth certain criteria that applicants had to meet, including physician experience and leadership qualifications, and the exclusion of doctors who continued to maintain a private practice.

Sharp received three applications, one of which was from a group that some Frost members belonged to, Memorial Hospitalists Association (MHA). After committee consideration, Sharp awarded the exclusive contract to SDHA, and amended its ER call policy accordingly.

### B. Causes of Action Affected by Motions

In October 2010, Frost brought this lawsuit seeking injunctive and monetary relief on the basis that the RFP procedure for awarding the exclusive contract had unfairly precluded Frost members from continuing to provide hospitalist services to Sharp's unassigned patients. Frost's substantive causes of action alleged that the RFP process was not justified by the circumstances, and that its design and procedural implementation had violated provisions of the ER call policy and Sharp's bylaws. Frost alleged that the exclusive contract would so align physician and hospital interests as to allow price manipulation and prevent competitive rates for services. Frost relied on the Cartwright Act for remedies against such alleged wrongful elimination or reduction of competition.

Frost further pled that under the UCL (§ 17200 et seq.), Respondents' actions amounted to unfair competition and unfair business practices that should be enjoined, such as Sharp's failure to enforce the ER call policy. Restitution was sought. Frost sought tort damages for IIPEA, based on Respondents' "independently wrongful" acts that interfered with Frost's economic relationships with third parties (i.e., Sharp's unassigned patients who had been admitted under the previous ER call policy). Frost claimed that Respondents knew of those relationships, but their intentional and wrongful acts to proceed with the sham RFP, thereby violating the ER call policy, had unfairly

6

disrupted those relationships. Frost suffered economic harm from those acts, in the form of lost business opportunities to participate in an ER call panel.

Frost twice applied for temporary restraining orders and sought a preliminary injunction to prevent the revised ER call policy from going into effect in December 2010. The court denied the applications, noting at one hearing that Sharp's decision seemed to be based on the opinion that Dr. Roth's group had the advantage of his greater administrative experience. As an unsuccessful bidder in the RFP process, the court said, Frost lost "a beauty contest here. That's all. It happens all the time."

### C. Motions for Summary Judgment or Adjudication

Respondents answered the complaint and Sharp brought a motion for summary judgment or adjudication of each cause of action against it. The other respondents joined in the motions (mainly claiming Frost's theories were actually attacking Sharp as the RFP proponent, not the SDHA successful bidder).

In its motion, Sharp relied on authorities stating that an exclusive contract between a hospital and a single medical provider is lawful as long as the decision to enter into the contract was not "irrational, arbitrary, or capricious." (*Major, supra*, 71 Cal.App.4th 1380, 1400.) Sharp claimed as partial justification for its actions that it was required to comply with ongoing changes in health law, which included the 2010 enactment of the federal Patient Protection and Affordable Care Act (the "Affordable Care Act," 124 Stat. 119), as well as Medicare regulations. All of those regulations affected the manner in which care should be delivered to Sharp's unassigned patients, and Sharp claimed that many hospitals, including itself, were being required to adapt policies with the goals of

7

providing patients with higher quality and more efficient care. They were motivated to do so in part by the goal of receiving adequate Medicare reimbursements and avoiding administrative penalties, and the RFP would assist in implementing these goals.

In explanation for its decision to issue the RFP, Sharp mainly relied on the declaration of Sharp's chief executive officer Smith. He stated the RFP was intended to address problems such as excessive average lengths of hospital stays or excessive rates of readmission for unassigned patients, under applicable Medicare guidelines for reimbursement. The Medicare hospital compensation formula also included the criteria of patient satisfaction with physicians, which was only 53 percent in 2010 with regard to Sharp hospitalists. It was in Sharp's interest to increase patient satisfaction.

Sharp's separate statement set forth as undisputed facts that the RFP criteria would require the successful group to provide 24-hour hospitalist availability, and to be available to care for transferred obstetric patients. The RFP incentivized the contracting hospitalists' group to meet or exceed benchmark levels of patient satisfaction for physician services, as well as length of stay and quality of care, according to federal standards. An eight-member advisory committee reviewed the three bids and selected SDHA. The Sharp board accepted the choice. Frost did not submit a bid.

### D. Opposition, Reply and Rulings

In its opposition, Frost dropped a theory from its complaint that the RFP process had been violative of the ER call policy and Sharp's bylaws. Rather, Frost contended that even though the RFP process could have been validly pursued, in this case, it was sham and irrationally designed, as alleged in each of the three statutory and tort causes of

8

action. At deposition, one Frost doctor criticized the facts offered to justify the preparation of the RFP, on the basis that the emergency admissions statistics Sharp used had incorrectly compared different sets of patients, some of whom were healthy patients of primary care physicians, while others were homeless or otherwise had no ongoing health care. Also, Sharp used "faulty" data relating only to internal medicine physicians, as justification for pursuing the exclusive contract, even though a fair sample would have included other specialties as well.

Further, the RFP qualification criteria were said to be unfairly rigorous and could not be satisfied by Frost physicians, who had relatively short lengths of practice experience, and who had been unable to obtain desired appointments to Sharp committees, due to Sharp's favoritism and rivalries with others. Frost argued the RFP criteria unjustifiably disqualified some of its physicians, because they still had private practices.

Frost further argued that the manner in which the RFP was initiated was suspect, because some Frost physicians had recently left the employ of SDIMG and had complained to Sharp about the professional practices of SDIMG, but they were ignored. For a long time, Dr. Roth's doctors had been allowed to expedite their credentialing processes and had been given preferential treatment at Sharp. When several Frost doctors left SDIMG, they received unsupported care review letters, which they believed had targeted them improperly. Frost thus argued the RFP process was carried out in bad faith, and the outcome was preordained in favor of Dr. Roth's call group.

9

Frost provided deposition testimony from its physicians about the Sharp committee presentation of the RFP and how it appeared to be a done deal when presented. Other doctors confirmed that impression and said that they were afraid to refer patients to Frost doctors, because of expected retaliation they would receive from Dr. Roth.

Frost cited to other deposition testimony from its physicians about the relative strictness of the RFP criteria, which excluded hospitalists who continued to have outpatient practices, and which arbitrarily excluded newer doctors who did not have sufficient tenure or connections to be appointed on Sharp committees. Finally, after the RFP was implemented, some Frost doctors arranged with certain primary care physicians to care for their patients in the hospital, but Sharp would not honor those arrangements.

In Sharp's reply papers, Sharp raised evidentiary objections (overruled) and argued that Frost was changing the nature of its allegations, and the arguments that the RFP was sham, slanted or conducted unfairly actually fell outside the scope of the complaint. Even if those allegations were true, Sharp's bylaws had not required it to pursue the RFP process. In any case, it had reached a fair decision, based on a perceived need to contract with a single group of hospitalists.

The trial court heard arguments and confirmed the tentative ruling, stating that Sharp sufficiently established a reasonable basis for its decision, "and it is not for this court to substitute its judgment for that of Sharp." Even though the complaint could be read as adequately alleging that the RFP was "sham," Frost had failed to provide evidence that Sharp committed a "wrongful act" within the meaning of the Cartwright

10

Act.  Frost also did not establish there was an "unlawful, unfair or fraudulent" business practice, necessary for a violation of the UCL.

Likewise, the court ruled Frost's claim for interference with prospective business advantage was not supported by any proof that Sharp had committed acts that were independently wrongful by some legal measure.[4]  The court then commented that the issues raised by the complaint did not include the newly raised theory that Frost had recently obtained contracts with various health plans but they had been thwarted by the exclusive contract arrangement, and it declined to address such a theory.  Summary adjudication of the first five causes of action was granted for Sharp and Respondents.[5]

## DISCUSSION

## I

## *APPLICABLE STANDARDS*

We apply well-established rules of review to the rulings on the summary judgment and adjudication motions.  De novo analysis determines whether there is a triable issue as

---

[4]  Frost's cause of action for IIPEA was based on Respondents' "independently wrongful" anti-competitive acts or business practices (e.g., those "proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard"; see *Korea Supply v. Lockheed-Martin Corp.* (2003) 29 Cal.4th 1134, 1159).

[5]  Frost also set forth a sixth cause of action for breach of contract against Sharp alone, based on the previous ER Call List arrangement, in which individual Frost physicians had served on the panel and thus formed a contractual relationship with Sharp. On that cause of action, the court denied Sharp's and Respondents' motions, because Frost had adequately alleged that its doctors previously had a contract arrangement with Sharp under the old policy.  However, Frost dismissed without prejudice that remaining contract claim, pending this appellate review.  (See fn. 3, *ante*.)  It should also be noted that Frost conceded at the trial court level that two other causes of action that sought injunctive relief were not viable, and they too were dismissed.

11

to any material fact and whether the moving party is entitled to judgment as a matter of law. (*Certain Underwriters at Lloyd's of London v. Superior Court* (2001) 24 Cal.4th 945, 972.) As the defendants moving for summary judgment or adjudication, Sharp and Respondents had "an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.) A defendant may meet this burden either by showing that one or more elements of a cause of action cannot be established or by showing that there is a complete defense. "[A]ll that the defendant need do is to show that the plaintiff cannot establish at least one element of the cause of action[;] the defendant need not himself conclusively negate any such element . . . ." (*Id.* at pp. 853-854.)

Once the defendant has demonstrated the plaintiff's evidence is deficient, the plaintiff may successfully oppose the motion for summary judgment by showing the evidence permits conflicting inferences as to the particular element of the cause of action or by presenting additional evidence of its existence. (Code Civ. Proc., § 437c, subds. (c), (p)(1); *Silva v. Lucky Stores, Inc.* (1998) 65 Cal.App.4th 256, 261 (*Silva*).)

On appeal, we evaluate the respective evidentiary showings de novo, to determine if the evidence permits conflicting inferences as to a particular element of the plaintiff's cause of action, or as to a defense to it. In this context, Sharp has claimed the defense of entitlement to deference for its administrative, managerial decisionmaking. We determine whether it, as moving party, negated the opponent's claims, and examine whether the opposition demonstrated the existence of any triable material factual issues.

II

*PUBLIC POLICY CONTEXT AND OUTLINE OF ISSUES*

"Numerous cases recognize that the governing body of a hospital, private or public, may make a rational policy decision or adopt a rule of general application to the effect that a department under its jurisdiction shall be operated by the hospital itself through a contractual arrangement with one or more doctors to the exclusion of all other members of the medical staff except those who may be hired by the contracting doctor or doctors." (*Mateo-Woodburn v. Fresno Community Hospital & Medical Center* (1990) 221 Cal.App.3d 1169, 1183 (*Mateo-Woodburn*).)

In general, a hospital has "the right . . . to make rational management decisions, even when exercise of that right might prove adverse to the interests of specific individual practitioners." (*Redding v. St. Francis Medical Center* (1989) 208 Cal.App.3d 98, 106 (*Redding*); see *Wilson v. Hidden Valley Municipal Water Dist.* (1967) 256 Cal.App.2d 271, 286 (*Wilson*) [a bias or prejudice in favor of an established public policy does not invalidate a quasi-legislative, policy-based managerial decision].) "Judges are untrained and courts ill-equipped for hospital administration, and it is neither possible nor desirable for the courts to act as supervening boards of directors for every . . . hospital . . . in the state." (*Lewin v. St. Joseph Hospital of Orange* (1978) 82 Cal.App.3d 368, 385; *Mateo-Woodburn, supra*, 221 Cal.App.3d 1169, 1185.)

When challenges are brought to the quasi-legislative decision of a hospital governing body, the trial court will employ a relatively deferential standard of review. (*Major, supra*, 71 Cal.App.4th 1380, 1398-1399.) Even where a structural staffing

13

change may result in the exclusion of certain doctors from practice, "[i]f the justification is sufficient, the doctor's vested rights must give way to public and patient interest in improving the quality of medical services." (*Mateo-Woodburn, supra*, 221 Cal.App.3d at p. 1185.)

Frost essentially concedes that Sharp's decision to enter into an exclusive hospitalist contract was a quasi-legislative, management decision, not an adjudicatory one about any individual property rights in pursuing a livelihood. (See *Redding, supra,* 208 Cal.App.3d 98, 106.) Although Frost makes some vague policy arguments in its reply brief about the desirability of preserving property interests in medical staff privileges, it does not dispute that the central issue in this appeal is whether the subject managerial decision was rational and made in good faith. It contends Respondents had a greater legal responsibility, in structuring hospital business, to take into account the individualized interests of Frost, as another set of stakeholders. (See *Major, supra,* 71 Cal.App.4th at p. 1384 [the relevant interest groups include patients, physicians, and hospital administration].)

It is incorrect for Frost to argue for the application of an abuse of discretion standard to resolve the question of Sharp's good or bad faith. The courts are traditionally reluctant to specify how hospital contracting and staffing policies may be applied to individual practitioners or groups. (*Mateo-Woodburn, supra,* 221 Cal.App.3d 1169, 1184-1185; see *Pitts v. Perluss* (1962) 58 Cal.2d 824, 835, fn. 4 [if there appears to be some reasonable basis for the classification, a court will not substitute its judgment for that of the administrative body].) Although the three causes of action Frost is pursuing

14

have distinct elements, whether they should properly have survived this summary adjudication motion depends on several common issues. The proper inquiries on appeal are whether Frost brought forward sufficient opposing evidence in support of its contentions that the Sharp decisions were irrational, (a) because no need for an exclusive contract model of practice was ever demonstrated, or (b) the criteria in the RFP were excessively stringent and inappropriately designed to selectively rule out Frost from consideration. Frost also had the obligation to bring forward evidence showing there were triable issues about whether the RFP process was procedurally unfair or sham, based on its timing, design or execution. (*Major, supra*, 71 Cal.App.4th at p. 1415.)

III

*RESPONDENTS' SHOWING IN MOTIONS*

A. Demonstrated Need for Exclusive Contract; Criteria in RFP

Respondents, as moving parties, had the initial burden of showing that their managerial decisions to set criteria for the RFP and to implement it were based on rational factors. (*Centeno, supra*, 107 Cal.App.3d 62, 72-74.) Sharp provided the declaration of its chief executive officer Smith, stating he had learned that in some cases, on-call hospitalists did not arrive promptly or at all for assessment of unassigned patients. There had been problems with supplying hospitalists on the ER Call List who would provide internal medicine care for obstetric patients who were hospitalized. The RFP for an exclusive contract addressed this problem for obstetrics patients.

Next, Sharp provided evidence that its recent length of stay figures for patients were higher than the national benchmark figures provided by Medicare. Hospitals that

15

have patients staying too long are financially disadvantaged in obtaining reimbursement from the government.

To address problems with its recent low patient satisfaction ratings, the RFP required the physicians in the contracting medical group to meet certain standards for attendance at the hospital site, for communication of discharge plans, for participation in meetings, and for record keeping of patient progress notes.

According to Smith, the Affordable Care Act will impose financial penalties on hospitals that have unduly high readmission rates. The RFP process was intended to make a single medical group responsible for readmissions, to promote consistency and certainty.

The criteria set forth in the RFP were established after discussions with Sharp medical staff, regarding appropriate standards for qualifying hospitalists, such as their history of leadership positions at Sharp. Qualifying hospitalists would not be allowed to maintain active outpatient practices, in order to increase their availability to the hospital. (See *Mateo-Woodburn, supra*, 221 Cal.App.3d at p. 1184 [decision is quasi-legislative in nature when it is "undertaken as a general effort to address an administrative problem . . . affecting other functions within the hospital and the overall quality of medical services"].)

Respondents set forth sufficient evidence, as above, that the decision to pursue the RFP was not wrongful or irrational, based on the recent history about conflicts in coverage and problems with compliance with standards. Further, the RFP criteria for the successful bidder was not entirely unrelated to the future performance expected of the

16

chosen group, with regard to availability and professional standing.  In these respects, Respondents adequately showed the decision was rationally based on valid considerations of hospital management, thus shifting the burden to Frost to demonstrate otherwise.

## B.  Procedural Fairness

Respondents sought to meet their initial burden on summary adjudication to show the procedural fairness aspect of their defense, by outlining the method in which the RFP was developed and implemented.  Smith's declaration said it was his idea to issue an RFP seeking bids for a contract with a single group of hospitalists.   His administration solicited input about the contents of the RFP from different members and committees of the hospital's medical staff.  Smith discussed the issues at a meeting of the emergency and acute care steering committees.  He also met with a Sharp supervisory committee for its internal medicine department, and Sharp's medical staff's executive committee.  An "open forum" was held on the subject for interested members of the medical staff.

After deciding to proceed, Sharp circulated the final RFP to all members of the ER call panel, including Frost's physicians.   Three bids were received and evaluated by an eight-person "Advisory Committee."  Its members represented Sharp's board of trustees, Sharp's medical staff, Sharp's administration, and a vice president of Sharp HealthCare. The committee interviewed and ranked the three bidders, on promised quality of care and customer service, as well as leadership and organizational status.  SDHA was rated highest.

Having presented evidence of the development and use of the above criteria, Sharp set forth enough of a justification and explanation of the RFP procedure to make a prima

17

facie showing that it was entitled to summary adjudication on the three related unfair competition claims. (*Centeno, supra,* 107 Cal.App.3d 62, 72-74; see *Silva, supra*, 65 Cal.App.4th at p. 261.)

IV

*FROST OPPOSITION; ANALYSIS*

A.  Rationality of Criteria for RFP

Frost's response sought to raise material factual disputes about the wrongfulness of the substantive criteria used to justify the preparation of the RFP, and about the excessively strict, biased or irrational nature of the qualifications set forth in the RFP for the successful bidder.  Frost contends the process was controlled by favoritism and disputed facts should be resolved at a court or jury trial.

First, Frost objects that Sharp used faulty data that related only to internal medicine physicians, when it decided to pursue a contract with a single hospitalist group. One of the Frost physicians testified at deposition that the admissions data used to show that Sharp had had problems with Medicare reimbursement criteria, and that there would likely be similar problems with the Affordable Care Act, incorrectly compared the types of emergency patients who had to be admitted or readmitted.  Some such patients were especially vulnerable (homeless and/or lacking in regular medical care), while others were healthy and had primary physician care.  Further, the admissions data used were arguably misleading because they compared different types of physician practices and track records, and limited them to internal medicine only, but without justification.

18

In the appellant's reply brief, Frost focuses on some of the policies set forth in the Affordable Care Act and argues, for the first time on appeal, that in preparing the RFP, Sharp should not have focused upon such factors as readmission rates or patient satisfaction ratings, but instead, Sharp should have avoided a closed staff system, to promote wider access to medical care in accordance with the principles of that Act. However, Frost cannot show that such abstract policy issues were properly brought before the trial court in this context, and we need not address them here.

Frost also submitted evidence in an effort to prove that Sharp must not have actually relied upon a valuable data set about admissions or patient satisfaction. One Frost doctor told Sharp officials that he left SDIMG because he questioned its ethics, billing, communications, and compensation. Since Sharp did not investigate those allegations, Frost contends that inferences can be drawn that Sharp was not very interested in quality of care, but rather mainly interested in promoting the interests of SDIMG.

Next, Frost argued that the qualifications set forth in the RFP were specifically designed to favor the Roth call group, which had collectively more seniority and more committee assignments than the Frost doctors had. Frost claimed its evidence was sufficient to create an inference that Sharp was "biased" in favor of SDHA. For example, Sharp gave preferential treatment to physicians who were members of the Roth call group, by expediting their qualification procedures. When some Frost doctors left the employ of SDIMG, they received warnings from Dr. Roth that they would not be allowed to take any calls on the ER Call List. Dr. Roth was heard by colleagues to brag or boast

19

that his group was going to get the contract, and other doctors agreed that was going to happen.

Frost contends its evidence definitively showed that Sharp took intentional actions "directed specifically toward the exclusion of a particular physician or groups of physicians." (*Redding, supra*, 208 Cal.App.3d at p. 104.) It points to incidents of personal animosity between Dr. Roth's group and its own members. In a similar factual context in *Major, supra*, 71 Cal.App.4th 1380, 1415, the court observed: "There is no question the selection process was not a model of consistency and could have been done better or differently. However, it is not the role of a reviewing court to question the wisdom of an employment decision." Here too, it is not enough for Frost to claim that a different decision would have been justified or should have been made, based on alternative viewpoints. Different rational conclusions could be reached on the same set of facts, which included known logistical and financial problems with the previous ER call system, and the good reputation of SDHA physicians, who apparently amounted to a known quantity in which the Sharp administration had confidence. (See *Mateo-Woodburn, supra,* 221 Cal.App.3d 1169, 1185 [when hospital considers various alternatives and selects a method to solve a problem, the courts are not in a position to disagree].)

The trial court had an adequate basis in the record to find that the Sharp decision on the RFP was not predominantly based on consideration of unlawful criteria, and that it was undertaken "for less personally directed reasons." (*Redding*, *supra*, 208 Cal.App.3d 98, 104.) There were rational reasons put forth for the decision to pursue the RFP

20

process, and for establishing the qualifications to be met. (*Mateo-Woodburn, supra,* 221 Cal.App.3d 1169, 1183-1184; *Major*, *supra*, 71 Cal.App.4th 1380, 1398-1399.) Some reasonable basis for the classification or administrative decision has been demonstrated, and regarding this factor, we refrain from substituting our judgment for that of the administrative entity. (*Pitts v. Perluss, supra*, 58 Cal.2d 824, 835, fn. 4; *Major, supra*, at p. 1398.)

B. Procedural Fairness, "Bad Faith" Claims

Frost next contends that the Sharp action in issuing and deciding on the RFP should not qualify as a protected quasi-legislative decision, because it was not actually "one of general application intended to address an administrative problem as a whole and not directed at specific individuals." (*Major, supra,* 71 Cal.App.4th at p. 1398.) Frost again claims the RFP procedures were unfair and entirely directed by favoritism for the Roth call group.

As support, Frost points to evidence that when several of its doctors left SDIMG and made criticisms about it to Sharp, the RFP process followed. Frost would have this court draw inferences that the leading RFP motivation was to protect the Roth interests. For example, Sharp did not investigate Frost's complaints about SDIMG, the Roth call group. Some of the Frost doctors testified about their beliefs that Dr. Roth and his group were working to prevent them from being eligible for the ER call panel. Some of the Frost doctors received unsubstantiated care review letters, which they attributed to the adverse influence of Dr. Roth.

21

Frost contends that the trial court incorrectly relied on *Wilson, supra*, 256 Cal.App.2d 271, 286 for the concept that an administrative body's "bias or prejudice" in favor of its own established policy does not invalidate a quasi-legislative managerial decision on a related matter, that is otherwise supported. Frost argues that *Wilson* should be distinguishable, because "Sharp's prejudice and bias in favor of Dr. Roth's group goes to the heart of the issue: whether Sharp acted in good faith in implementing an entirely new policy at the hospital. [¶] The evidence of bias and prejudice Frost . . . set forth in its opposition papers was not bias and prejudice Sharp exhibited in favor of a specific policy, but rather bias and prejudice which Sharp exhibited towards a favored former Chief of Staff to the exclusion of the Frost . . . doctors which [led] to the implementation of a sham RFP. That is a significant difference which makes *Wilson* very distinguishable from the instant case."

Respectfully, we think that Frost misses the point. Although there was conflict at the hospital, not all of it was entirely personal. The Sharp management could justifiably develop such a new policy as a response to recent reported problems with coverage for different types of emergency patients, and in response to financial constraints imposed by government programs such as Medicare, regarding admission rates and patient satisfaction reports. Once the RFP process began, the methods used to develop its criteria and for review of the proposals were based on hospital professional committee work, justifying inferences that appropriate decisionmaking processes were followed. The factor that different outcomes could have been decided on the same evidence does not

22

prove that the Sharp decisions were wrong or sham. (*Major, supra*, 71 Cal.App.4th at p. 1415.)

Specifically, the evidence produced by Frost does not support its Cartwright Act cause of action that claimed the RFP's exclusive contract constituted predatory economic behavior that would wrongfully align physician and hospital interests, thus allowing illegal price manipulation. (See *Korea Supply, supra,* 29 Cal.4th 1134, 1160-1161.) Frost did not demonstrate the existence of triable issues about whether the RFP procedure constituted unfair competition, because Respondents were able to set forth evidence of rationally based criteria for pursuing it, in the form it took. Moreover, the execution of the RFP process allowed interested stakeholders a chance to respond, and the process was not demonstrably sham or procedurally unfair. (*Mateo-Woodburn, supra*, 221 Cal.App.3d at p. 1186.) Similarly, the disputed care review referrals were found to be unsubstantiated concerning Frost doctors, suggesting that the process was not corrupted.

With respect to Frost's UCL and tort claims, the managerial activities of Sharp were shown to be defensible as falling within the sphere of lawful administrative behavior, in this legal context. (*Korea Supply, supra,* 29 Cal.4th 1134, 1159-1160.) In Frost's IIPEA cause of action, it claims that Sharp and Respondents acted wrongfully. "An act is not independently wrongful merely because defendant acted with an improper motive." (*Id.* at p. 1158.) An act is independently wrongful if unlawful, "that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." (*Id.* at p. 1159.) But here, Respondents showed that because of the nature of the hospitalist practice and the structure of the business in which

23

it operated, they are entitled to assert the defense of entitlement to judicial deference for managerial, administrative decisions.  Frost did not sufficiently rebut their showing with demonstrations that it suffered legal wrongs, through the acts of any of the Respondents. (*Mateo-Woodburn, supra,* 221 Cal.App.3d 1169, 1188-1189.)

In conclusion, it would not be appropriate to reverse the judgments to allow a trier of fact effectively to second-guess rationally based hospital managerial, quasi-legislative decisions.  Legitimate public policies underlie judicial recognition of and deference to special expertise in the field of hospital administration.  (*Redding, supra,* 208 Cal.App.3d at p. 106.)  These rulings are legally correct and we affirm the judgments of dismissal of the remaining claims.

## DISPOSITION

Judgments affirmed.  Costs are awarded to Respondents.

HUFFMAN, J.

WE CONCUR:

McCONNELL, P. J.

NARES, J.

24